604 A.2d 445

EAGLE–PICHER INDUSTRIES, INC. et al.

v.

Paul BALBOS, Personal Representative
of the Estate of Leslie Balbos et al.

No. 22, Sept. Term, 1991.

Court of Appeals of Maryland.

April 10, 1992.

Chasanow, J., concurred in result only.

Louis G. Close, Jr. (Warren N. Weaver, Lisa A. Kershner, Whiteford, Taylor & Preston, Baltimore, all on brief), Dennis C. Whelley (Mann & Whelley, P.A., Towson, on the brief), for petitioners/cross respondents.

Harry S. Johnson, Gardner M. Duvall, Whiteford, Taylor & Preston, Baltimore, amicus curiae for Owen–Illinois, Inc.

Harry Goldman, Jr. (David M. Layton, Steven G. Warm, William A. Musto, Goldman & Skeen, P.A., Baltimore, all on brief), for respondents/cross petitioners.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and KARWACKI, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (Retired), Specially Assigned.

RODOWSKY, Judge.

These consolidated tort actions arise out of the deaths of two former shipyard workers. Their deaths were caused by malignant mesothelioma resulting from inhalation of microscopic asbestos fibers. Judgments in favor of the plaintiffs were appealed to the Court of Special Appeals which affirmed the award of compensatory damages and reversed

the award of punitive damages. *Eagle–Picher Indus. v. Balbos*, 84 Md.App. 10, 578 A.2d 228 (1990). Thereafter, we granted cross petitions for certiorari. 322 Md. 737, 589 A.2d 968 (1991), 325 Md. 248, 600 A.2d 418 (1992).

The instant appeals were argued on the same day as *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633, *reh'g denied*, 325 Md. 665, 602 A.2d 1182 (1992). Unlike *Zenobia*, where the jury verdicts in favor of the plaintiffs rested exclusively on strict liability in tort under the principles of § 402A of the Restatement (Second) of Torts, the plaintiffs' verdicts in the instant matter were rendered solely on their negligence claims.[1]

One of the decedents, Leslie Balbos, died in 1983. His asbestos exposure occurred during 1942–1944 when he worked as a sheet metal mechanic at the Fairfield Shipyard of Bethlehem Steel Corporation (Bethlehem). The other decedent, Sutton Knuckles (Knuckles), was employed at Bethlehem's Key Highway Shipyard from 1941 to 1982 as an iron worker-erector. He died in 1984.

From among the defendants originally named, we are concerned here only with three asbestos manufacturers and two suppliers/installers of asbestos. The three manufacturers are Eagle–Picher Industries, Inc. (Eagle), Owens–Illinois, Inc. (Owens), and Pittsburgh Corning Corporation (Pittsburgh). The two installers are ACandS, Inc. (ACandS) and Porter Hayden Company (Porter).

In the *Knuckles* case judgment was entered for $1.8 million in compensatory damages against certain defendants, including petitioners ACandS, Eagle, Owens, Pittsburgh, and Porter. In addition, judgments were entered in favor of the *Knuckles* plaintiffs for punitive damages of $100,000 against Owens and of $50,000 against Eagle. In the *Balbos* case judgment for compensatory damages totaling $2 million was entered on jury verdicts against certain

---

**1.** In special verdicts the jury expressly found that the deaths had *not* been caused by an unreasonably dangerous product.

defendants, including petitioners Eagle and Porter. No punitive damages were assessed against any defendant in *Balbos.*

Each petitioning defendant was allegedly a supplier of chattels, *i.e.,* asbestos products. Each decedent was allegedly a member of a class whom the supplier should have expected to have been endangered by the product. The only theory of liability with which we are concerned is a negligent failure to warn. It is conceded that no defendant warned users of the dangers of asbestos prior to the mid-1960s. No defendant contends that it was physically impossible or economically prohibitive for it to have affixed a warning to its product at an earlier time. No defendant contends that either decedent was guilty of contributory negligence. Rather, the defendants' principal arguments address the sufficiency of any nexus between their conduct and the allegedly wrongful deaths.

Although the careful and comprehensive opinion by Judge Alpert for the Court of Special Appeals in its *Balbos* addressed twenty issues, 84 Md.App. 10, 578 A.2d 228, the issues that the petitioners present on this certiorari review can be consolidated into ten issues. These involve: (I) the number of defense peremptory strikes; Eagle's (II) and Porter's (III) duties to warn; Eagle's (IV) and Porter's (V) products as substantial factors in causation; Bethlehem as a sophisticated user (VI) and its conduct as a superseding cause (VII); the possible efficacy of any warning (VIII), particularly in mesothelioma cases (IX); and (X) a bundle of punitive damages arguments.

Additional facts necessary for a consideration of each question will be presented with the discussion of that issue.

## I

### Peremptory Challenges

The petitioning defendants submit that the circuit court erred by denying them their right to participate in the

exercise of six peremptory challenges. Maryland Rule 2–512(h) governs. It reads:

"Each party is permitted four peremptory challenges plus one peremptory challenge for each group of three or less alternate jurors to be impanelled. For purposes of this section, several plaintiffs or several defendants shall be considered as a single party unless the court determines that adverse or hostile interests between plaintiffs or between defendants justify allowing to each of them separate peremptory challenges not exceeding the number available to a single party. The parties shall simultaneously exercise their peremptory challenges by striking from the list."

The problem here arose near the end of a day devoted to voir dire. The working premise of the circuit judge had been to consider manufacturer defendants and installer defendants as adverse or hostile interests, to each of which the court would allow separate peremptory challenges equal to the number available to a single party. This approach had been used in other asbestos disease cases in Maryland trial courts. Inasmuch as the circuit judge had determined to seat four alternate jurors, that approach would allow a total of eighteen peremptory strikes and require, at a minimum, a venire of thirty-four persons $(12 + 4 + 18)$. Excuses and challenges for cause had reduced the venire to twenty-eight persons.

The court explored alternatives with counsel. The plaintiffs were willing to waive two challenges and to exercise only four, thereby making a total of eight challenges available for all defendants $(12 + 4 + 4 + 8 = 28)$. For present purposes there were two separate interests on the defendants' side of the case, the petitioning defendants and MCIC, Inc., an installer which had separate counsel. MCIC insisted on independently exercising six peremptories.[2] Petitioners insisted that they be allowed to exercise six per-

---

2. MCIC was a defendant only in the *Balbos* case and obtained a verdict in its favor on liability.

emptory challenges, separately from MCIC.[3] The circuit court ruled that there would be eight peremptory challenges exercised on the defendants' side, four by petitioners and four by MCIC, separately from each other.

As a result of this ruling, the petitioning defendants did not participate in exercising six peremptory strikes. Further, by treating MCIC as a separate interest, the court necessarily concluded that MCIC and the petitioning defendants had adverse or hostile interests. The trial judge need not expressly have articulated that finding. *See Kloetzli v. Kalmbacher,* 65 Md.App. 595, 599, 501 A.2d 499, 501 (1985), *cert. denied,* 305 Md. 621, 505 A.2d 1342 (1986). Petitioners, who had urged in the circuit court that they be treated as an interest adverse to MCIC, do not question the underlying finding of adversity.[4]

Petitioners' argument is that, upon the finding of adverse interest, Rule 2–512(h) "requires that ... adverse co-parties are entitled to participate in the exercise of the same number of peremptories as the co-parties would otherwise collectively share in the absence of adversity." Brief of ACandS, *et al.,* at 38. In terms of a jury of twelve persons with four alternates, petitioners' submission is that they were entitled to participate in six strikes, so that MCIC would have been entitled to exercise six strikes as well.

This argument ignores a previous interpretation of Rule 2–512(h) in *St. Luke Evangelical Lutheran Church v. Smith,* 318 Md. 337, 568 A.2d 35 (1990), where we stated:

---

**3.** Counsel representing the petitioning defendants, other than Eagle, explained to the trial court that the conflicts between their manufacturer clients and their installer clients related only to selected issues on which separate counsel were advising the particular clients, who, after full disclosure, had consented to joint representation on "generic" issues in the interest of economy.

**4.** For this reason we do not consider the petitioners' contentions that some of the challenges available to all defendants should have been exercised in common with MCIC. Under Rule 2–512(h) the basis for the trial court's ordering "separate" challenges is the finding of adversariness.

"When there is a single party on one side and multiple parties on the other, the single party will be entitled to four peremptory challenges while the coparties will *ordinarily* share four strikes. A single party, then, will have twice as many strikes as each opposing coparty. If, however, the court rules that the coparties have adverse or hostile interests, those parties *may be* allowed up to four peremptory strikes each."

*Id.* at 342–43, 568 A.2d at 37 (emphasis added). Although this language clearly conveys that the trial judge has discretion to limit each adverse coparty's interest to less than a full allotment of strikes, the quoted language was not essential to the outcome of the case. Here, after considering the history and purpose of Rule 2–512(h), we confirm the interpretation in *St. Luke Church* and in the instant case by the Court of Special Appeals.

▪ The Court of Special Appeals interpreted Rule 2–512(h) to provide that, upon finding hostility with a coparty, the trial court, in its discretion, could divide among the separate interests the strikes to which, absent hostility, all plaintiffs or all defendants were entitled, to be exercised separately, or the court could grant additional strikes and allocate the peremptories, so increased, among the separate interests, to be exercised separately by each interest. *Balbos,* 84 Md.App. at 85, 578 A.2d at 265. The Court of Special Appeals further held that "[t]he only limit placed on the discretion of the trial judge is that the number of challenges to be exercised separately by an adverse [interest] may not exceed the number available to a single party." *Id.*

As *Kloetzli* pointed out, after making a finding of adverse or hostile interest, the court "must determine whether that interest would justify allowing the added challenges." 65 Md.App. at 599, 501 A.2d at 501. *Kloetzli* did "not hold, however, that every case involving an adverse or hostile interest mandates additional peremptory challenges." *Id.* at 603, 501 A.2d at 503. The text of Rule 2–512(h) is fully satisfied if the court concludes that the adverse interests do

not justify any additional peremptories, and the court simply divides the basic allotment of peremptories between the adverse interests, to be exercised separately.

It is also clear that the reference in Rule 2–512(h) to "the number [of challenges] available to a single party" is a limit on the increase in the number of peremptory challenges which the court, after finding an adverse interest, may allow to one or the other side of the action. The provision does not mandate that the maximum number of challenges permitted to an interest actually be awarded to each adverse interest, or that each adverse interest participate in exercising the maximum number of challenges permitted, as petitioners in essence contend. Petitioners' argument does not give full effect to the words "not exceeding," and would have the maximum ceiling and the minimum floor become one and the same. Were that the intention Rule 2–512(h) would read that the court should allow to each adverse interest "separate peremptory challenges equal to the number available to a single party."

Petitioners point to *Kennedy v. Mobay Corp.*, 84 Md.App. 397, 428–29, 579 A.2d 1191, 1207 (1990), *aff'd on other grounds*, 325 Md. 385, 601 A.2d 123 (1992); *St. Luke Evangelical Lutheran Church v. Smith*, 74 Md.App. 353, 361, 537 A.2d 1196, 1200 (1988), *rev'd on other grounds*, 318 Md. 337, 568 A.2d 35 (1990); and to *Kloetzli, supra,* where the trial courts, upon finding adverse interests, allowed each interest to exercise the number of peremptories allowable to a single party. Those cases, however, do not represent holdings that the actions by the trial courts were required under Rule 2–512(h). Those trial court actions are consistent with the discretion permitted under the rule as we interpret it.[5]

---

5. P. Niemeyer & L. Richards, *Maryland Rules Commentary,* at 290 (1984), speaking of Rule 2–512(h), states: "For example, two plaintiffs with a uniformity of interest are entitled to four peremptory challenges between them. On the other hand, two defendants who have filed cross-claims against each other have interests adverse to each

The history of the provision, as reflected in the archives of the Standing Committing on Rules of Practice and Procedure, also supports the interpretation applied here. Former Maryland Rule 543 a.4 gave the trial court discretion to permit additional peremptory challenges on a finding of adversity between coparties. *See Kloetzli,* 65 Md.App. at 598, 501 A.2d at 501. In the process of the revision leading to the current rules, which became effective July 1, 1984, the Rules Committee considered peremptory challenges in civil cases at a meeting in 1981. One member observed that "if there are three plaintiffs and one defendant and the court determines that adverse or hostile interests exist between all plaintiffs," then, under the draft then being considered, "each plaintiff would receive four peremptory challenges." Minutes, Rules Committee, meeting of April 21, 1981, at 24. A member of the Rules Committee at that time who, coincidentally, was the trial judge in the matter *sub judice,* said that then Rule 543 a.4 "alleviates this situation to some extent by giving the court discretion to allow 'additional' peremptory challenges." *Id.* A motion was carried to embody that concept in the rule's revision, and that concept carried through to present Rule 2–512(h).

Petitioners alternatively argue that the trial court abused its discretion in applying Rule 2–512(h), because, as the record reflects, a substantial motivation underlying the trial judge's ruling was to avoid sending for more prospective jurors the next day and resuming the voir dire process. As seen above, the circuit court had the power to allocate eight strikes evenly between the two hostile interests on the defendants' side. There was no abuse of discretion in not enlarging the number to six strikes per interest. First, the trial judge was not overly impressed by the degree of hostility between the petitioners and MCIC, an installer, given the joint representation by one law firm of both manufacturers and installers in the very case before the

---

other and are each entitled to four." We do not agree that it is a matter of entitlement, as opposed to discretion.

court. Second, the plaintiffs' surrender of two challenges permitted the court to increase the strikes respectively allowable to petitioners and to MCIC from three each to four each. Thus, although the court had the power simply to divide the required six challenges on the defendants' side between the two interests, each interest received an additional challenge.

## II

### Eagle's Duty to Warn

■ Eagle submits that it had no duty to warn in *Balbos* where the decedent's exposure to asbestos began in 1942 and ended in 1944. The general concept which Eagle invokes is that too little was known about the health hazards of asbestos prior to 1944 so that a court must declare, as a matter of law, that due care could not require warnings.[6] Eagle, however, seeks further to limit that analysis to knowledge of asbestos-induced mesothelioma in persons who did not work directly with asbestos products. Eagle's position is factually unsupported at the level of the general concept, and it is legally incorrect at the level of specific application.[7]

Eagle is a manufacturer. A manufacturer is liable for failure "to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it...." Restatement (Second) of Torts

---

**6.** In the course of the direct examination of the plaintiffs' principal witness on state of the art, the circuit court instructed the jury to limit its consideration in the *Balbos* case to state of the art through 1944. No party in this Court complains of that ruling.

**7.** Eagle would have us further limit the analysis to chrysotile asbestos. Eagle argues that its products contain only chrysotile asbestos and that mesothelioma cannot be caused by that type of asbestos. This argument ignores conflicting evidence as to both of its underpinnings. The argument also ignores that the jury could have found that the expert on whose testimony the argument rests had been substantially impeached.

§ 395. For purposes of applying the "should have known" component of the foregoing standard, a manufacturer of a product is held to the knowledge of an expert in the field. *Babylon v. Scruton*, 215 Md. 299, 304, 138 A.2d 375, 378 (1958) (negligence). The manufacturer " 'must keep reasonably abreast of scientific knowledge and discoveries touching his product....' " *Id.* (quoting Harper & James, *The Law of Torts* § 28.4).

Here Dr. Castleman, the plaintiffs' principal expert on state of the art, traced the scientific literature beginning in 1898 (with the exception of one reference to the Roman historian, Pliny) through 1941. He brought to court and described in his testimony approximately forty pre–1942 articles dealing with the health risks of asbestos which appeared in scientific, industrial, and governmental publications. He said

"there were at least 200 articles that had appeared [up to 1942], probably more like three hundred.... But if you count things like National Safety Council publications that talked about lung diseases and mentioned asbestosis, as well as articles solely devoted to asbestosis and cancer from asbestosis, well, then, you'd be well over 200."

One of the works referred to by Dr. Castleman was an encyclopedia, *Occupation and Health*, published by the International Labor Office in Geneva *circa* 1930. It contained a section on asbestos which included a subsection headed "Dangers and Hygiene." It referred to the refusal by American and Canadian life insurance companies to insure asbestos workers because of assumed deleterious conditions in the industry, a fact that had been reported in 1918 in a United States government publication. Two doctors in England prepared a fifteen page article on asbestosis as part of a 1938 supplement to the encyclopedia. That article was read by an Eagle sales representative, H.M. Aber, when calling on the Texas State Board of Health in April 1942. In a written report to Eagle, circulated to at least three persons in that corporation, the sales representative, referring to the article, said: "If you think mineral

wool is dangerous you should read this," and "I urge you to read this as it is very informative."

Eagle's response to the state of the art literature is that it does not sufficiently alert a manufacturer to a connection between asbestos and mesothelioma in bystanders. That is not the correct unit of consideration. In *Moran v. Faberge,* 273 Md. 538, 332 A.2d 11 (1975), the issue was whether the manufacturer of a flammable cologne was liable for the failure to warn of the product's flammability when the product had been ignited because a teenager had sprinkled a lighted candle with the cologne. We said that

> " ' "the pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. Rather, *the question is whether the actual harm fell within a general field of danger which should have been anticipated."* ' "

*Id.* at 551, 332 A.2d at 19 (quoting *Segerman v. Jones,* 256 Md. 109, 132, 259 A.2d 794, 805 (1969)) (quoting *McLeod v. Grant County School Dist.,* 42 Wash.2d 316, 321, 255 P.2d 360, 363 (1953)). *Moran* also pointed out that " ' *"foreseeability" refers to the general type of harm sustained.* It is literally true that there is no liability for damage that falls entirely outside the *general threat of harm* which made the conduct of the actor negligent. . . . [I]f the harm suffered falls within the general danger area, there may be liability, provided other requisites of legal causation are present.' " *Id.* at 551–52, 332 A.2d at 19 (emphasis added in *Moran* opinion) (quoting Harper, *A Treatise on the Law of Torts* § 7 (1933)). *See also* Restatement (Second) of Torts § 435, comment a ("The fact that the actor, at the time of his negligent conduct, neither realized nor should have realized that it might cause harm to another of the particular kind or in the particular manner in which the harm has in fact occurred, is not of itself sufficient to prevent him from being liable for the other's harm if his conduct was negligent toward the other and was a substantial factor in bringing about the harm.").

While the fact that ultimate harm suffered by Balbos would take the form of mesothelioma rather than asbestosis could not have been foreseen by Eagle, this distinction will not preclude liability. In the matter before us the jury could find that Eagle knew or should have known of the hazard of lung disease produced by inhaling asbestos fibers. Mesothelioma is a form of lung disease caused by inhaling asbestos fibers. There was sufficient evidence to support a finding that Eagle had a duty to warn.

### III

### Porter's Duty to Warn

Porter was formed in 1928 by four former employees of Johns–Manville for the purpose of installing insulation, principally around industrial pipes. Porter never manufactured asbestos products.[8] It purchased them from manufacturers, mostly Johns–Manville, and, Porter, through its employees, installed those products as a subcontractor at the Fairfield Shipyard and elsewhere. In the *Balbos* case, Porter unsuccessfully moved for judgment at the close of all evidence, asserting a lack of proof that Porter, prior to 1944, knew about the health hazards of asbestos fibers.

Porter argues here that the Court of Special Appeals applied an incorrect standard when it reviewed the sufficiency of the evidence. The issue is whether Balbos was required to prove that Porter "knew" about the danger or had "reason to know" of it, as Porter contends, or whether Porter "should have known" of it, the standard that Porter says was applied erroneously by the Court of Special Appeals. Related to that issue is whether a nonmanufacturing supplier has a duty to inspect or test a product. *See*

---

8. A retired employee of Porter testified that the company had a small shop in which employees "fabricated some asbestos cement sheets into duct work for handling corrosive fumes." It is unnecessary to decide whether this would transform Porter into a manufacturer for purposes of failure-to-warn liability, because Balbos did not argue that any Porter-"fabricated" product caused his injury.

Restatement (Second) of Torts § 402 (1965); Annotation, *Seller's Duty to Test or Inspect as Affecting His Liability for Product–Caused Injury*, 6 A.L.R.3d 12 (1966) (*Seller's Duty*); *cf.* Md.Code (1974, 1989 Repl.Vol.), § 5–311 of the Courts and Judicial Proceedings Article (sealed container defense).

Porter emphasizes the approach currently taken by the Restatement, under which manufacturers and nonmanufacturing suppliers of products are held to different standards of "knowing" whether their products are dangerous or defective. In order to hold a retailer or other nonmanufacturing supplier liable on a negligence theory, a plaintiff must prove that the supplier knew or had "reason to know" of the danger of the product. *See* Restatement (Second) of Torts §§ 388(a), 399, 401 & comment *a*, 402; *Foremost–McKesson Corp. v. Allied Chem. Co.*, 140 Ariz. 108, 680 P.2d 818, 823 (Ct.App.1983); *Fernandes v. Union Bookbinding Co.*, 400 Mass. 27, 507 N.E.2d 728, 732 (1987).[9] A manufacturer, on the other hand, may be held liable when it "should recognize" that the product creates an unreasonable risk of physical harm. *See supra* Part II; Restatement (Second) of Torts § 395 & comment *e*. In the Restatement, "reason to know" and "should know" are terms of art:

"(1) The words 'reason to know' are used throughout the Restatement of this Subject to denote the fact that the actor has information from which a person of reasonable

---

**9.** Restatement (Second) of Torts § 388 (1965) reads:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.

"(2) The words 'should know' are used throughout the Restatement of this Subject to denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists."

*Id.* § 12; *see also id.* § 401 comment *a*, § 402 comments *d* & *e*.

There is no direct evidence that Porter knew of the danger of asbestos prior to 1944. Rather, Balbos relies on circumstantial evidence. Balbos submits that the purchases by Porter of asbestos from manufacturers support an inference that Porter had the same knowledge as manufacturers. Dr. Castleman testified that one issue of *Asbestos* magazine in 1930 contained an advertisement for Johns–Manville, a happy birthday wish to the president of Reid Hayden, a wholly owned subsidiary of Porter, and a notation referring to the U.S. Bureau of Labor Statistics' interest in pulmonary asbestosis. Dr. Castleman also testified that some general-knowledge encyclopedias included notes on asbestosis as early as 1939 or 1940.

The Court of Special Appeals reviewed this evidence and held that "[a] jury ... could reasonably infer that Porter Hayden *could have discovered* this information about the hazards of asbestos 'by utilizing the peculiar opportunity and competence which [it] has or *should have* as a dealer in' asbestos-containing products." *Balbos,* 84 Md.App. at 51, 578 A.2d at 248 (emphasis added) (quoting *Woolley v. Uebelhor,* 239 Md. 318, 325, 211 A.2d 302, 306 (1965)).

■ In *Zenobia* we held that a supplier-installer such as Porter is held to a "should have known" standard when the action is based on the principles of strict liability under

§ 402A of the Restatement. 325 Md. at 443 n. 11, 601 A.2d at 644 n. 11. We left open the question of whether the supplier-installer's standard would be different when the action is based on a negligent failure to warn. *Id.* We now hold that, as to a supplier-installer, it is not.

In *Woolley,* 239 Md. 318, 211 A.2d 302, a car dealer claimed that it should not be liable for an accident allegedly caused by brake failure, because the master cylinder was defective when the dealer acquired the car. This Court stated that "a vendor, like a manufacturer, is subject to liability if, although ignorant of the dangerous character or condition, he could have by the exercise of reasonable care discovered it by utilizing the peculiar opportunity and competence which he has or should have as a dealer in such chattels." *Id.* at 325, 211 A.2d at 306 (citing Restatement of Torts § 402). This Court, however, affirmed a directed verdict for the car dealer because a reasonable inspection by a competent dealer would not have revealed the defect. *Id.*

A similar issue arose in *Frericks v. General Motors Corp.,* 274 Md. 288, 336 A.2d 118 (1975), *appeal after remand,* 278 Md. 304, 363 A.2d 460 (1976), an automobile crash case involving allegations of negligent design of the roof supports and of the seat locking mechanism. The retail-seller car dealer was joined as a defendant. We cited *Woolley* for the above-quoted proposition. *Id.* at 304–05, 336 A.2d at 128. But we also said that "[d]ealers cannot be expected to duplicate the engineering and planning resources available to giant automobile manufacturers for the purpose of ascertaining that every model of car they sell is designed without negligence. " *Id.* at 305, 336 A.2d at 128. Because "it cannot be presumed from the mere existence of the defective design that the dealer had or should have had the requisite knowledge" and because there were no specific allegations that the dealer did so, we affirmed a dismissal on the face of the pleadings of the negligence count against the car dealer. *Id.* at 305–06, 336 A.2d at 128.

Neither *Woolley* nor *Frericks,* under the "should know" standard for retailers in products liability actions based on negligence, found any breach of a duty to test or inspect. *Woolley* cited the first Restatement's version of § 402.[10] The drafters of the Second Restatement deleted the "should know" standard of the original Restatement, and adopted the following rule:

"A seller of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not liable in an action for negligence for harm caused by the dangerous character or condition of the chattel because of his failure to discover the danger by an inspection or test of the chattel before selling it."

Restatement (Second) of Torts § 402 (1965).

The change was made because the cases did not support the earlier statement. The Reporter's notes for the Second Restatement comment that:

"The cases hold that there is no duty to inspect, except in the types of situations covered in original § 401. The doubt about whether there is a duty which is created by original § 402 should be dispelled by a clear statement that no duty exists. At the time these Sections were originally drafted, no decision of any Court of last resort in England or America had ever held that a vendor had a duty to inspect chattels before selling them."

Restatement (Second) of Torts § 402, app. at 458 (1965); *see also* 5 F. Harper, F. James & O. Gray, *The Law of Torts* § 28.29, at 556–58 & nn.8 & 9 (1986) (Harper & James) (criticizing Second Restatement for taking this position but acknowledging that it was well-supported by case law).

---

**10.** Restatement of Torts § 402 (1934) reads:

"A vendor of a chattel manufactured by a third person is subject to liability as stated in § 399, if, although he is ignorant of the dangerous character or condition of the chattel, he could have discovered it by exercising reasonable care to utilize the peculiar opportunity and competence which as a dealer in such chattels he has or should have."

The rationale of *Frericks* is consistent with that underlying the current form of § 402.

This Court looked to the Second Restatement's version of § 402 in *Telak v. Maszczenski,* 248 Md. 476, 237 A.2d 434 (1968). In that case the plaintiff was seriously injured when he struck his head on the bottom of a seven-foot-deep, backyard swimming pool after diving from the diving board. We affirmed a directed verdict for the retail seller who neither manufactured nor installed the pool. The opinion recognized the Second Restatement's distinction between "reason to know" and "should know." *Id.* at 485, 237 A.2d at 439. The Court applied that distinction to the retail seller when the plaintiff sought negligence liability under §§ 388 and 399 of the Restatement. Moreover, the opinion quoted the newer version of § 402, but found it inapplicable under the facts of that case. *Id.* at 487, 237 A.2d at 440.

 *Telak* and § 402 of the Second Restatement state the common law of Maryland: when a seller or other nonmanufacturing supplier is nothing more than a conduit between a manufacturer and a customer, the retailer ordinarily has no duty in negligence to discover the defects or dangers of a particular product. *See State ex rel. Bohon v. Feldstein,* 207 Md. 20, 31–34, 113 A.2d 100, 104–06 (1955) (allegation that landlord "should have known" of improper installation of water heater insufficient to state cause of action); *State ex rel. Bond v. Consolidated Gas, Elec. Light & Power Co.,* 146 Md. 390, 398, 126 A. 105, 108 (1924) (no tort duty owed to third party by retailer of auxiliary gas stove, sold in same condition as received, that leaked carbon monoxide); *Flaccomio v. Eysink,* 129 Md. 367, 374, 381, 100 A. 510, 513, 515 (1916) (neither liquor wholesaler nor saloonkeeper liable to purchaser of whiskey who was blinded because whiskey contained wood alcohol rather than grain alcohol); *Seller's Duty,* 6 A.L.R.3d at 17; 2 L. Frumer & M. Friedman, *Products Liability* § 6:03[1][a] (1991); Harper & James, *supra,* § 28.29, at 556–57. Absent statutory modification, a "conduit" supplier is held to the "reason to know"

standard of §§ 12, 388(a) and 401 of the Second Restatement.

The nonmanufacturing supplier, however, may do something more than merely act as a conduit of goods, and those additional acts may impose a higher standard of care upon the supplier. *See Kaplan v. Stein*, 198 Md. 414, 421–22, 84 A.2d 81, 84–85 (1951) (car dealer had duty to inspect used car that it loaned to customer who had returned purchased car for repair); *Seller's Duty, supra*, §§ 8, 10, 11; Harper & James, *supra*, § 28.29, at 559. In this case, Porter was not merely a conduit of goods. Porter not only supplied asbestos products to the shipyards, its employees also installed those products, and that installation created danger to other workers. In many cases retailer-installers have been held to a duty to inspect or test a product, although the standard of care is not necessarily as high as that imposed on a manufacturer. 2 Frumer & Friedman, *supra*, § 6.03[4], at 6–48, 6–54; *see* Harper & James, *supra*, § 28.-29, at 557 (arguing for a rule that would hold sellers to a duty of discovering defects that could be revealed by inspection, as opposed to mechanical testing); *Seller's Duty, supra*, § 8. It appears that in most of those cases, however, the retailer-installer has been negligent in the installation itself. *See* 2 Frumer & Friedman, *supra*, at 6.03[4] & n. 63.

Balbos did not argue, and the evidence does not suggest, that Porter's installation was negligent in that it departed in some way from the intentions of the manufacturer. Nor does Balbos argue that Porter had a duty to inspect or test the product. Balbos does submit, however, that Porter had a duty to discover that the product was dangerous by reading literature that was available at the time.

Here, Porter's installation activity, in addition to selling products manufactured by others, is analogous to the service department activities of automobile dealers, whose alleged negligence in products liability cases we have analyzed under a "should have known" standard. That standard considers what reasonably should have been discover-

ed in light of the supplier's peculiar opportunity and competence as a dealer in the particular type of chattel.

There was sufficient evidence here to allow a jury to find a duty on Porter to warn in 1942–1944. Porter was formed by former employees of Johns–Manville, a company that dealt almost exclusively in asbestos products. Porter installed or otherwise supplied asbestos products acquired almost exclusively from Johns–Manville. By 1947 Porter had offices in several of the mid-Atlantic states. Obviously asbestos was critical to Porter's business, and it is reasonable to infer that many Porter laborers were directly exposed to asbestos virtually every work day. It is an historical fact that, by Chapter 465 of the Acts of 1939, asbestosis was made compensable as an occupational disease under the Maryland workers' compensation act, so long as the injured employee had been involved in "[a]ny process or occupation involving an exposure to or direct contact with asbestos dust." Md.Code (1939), Art. 101, § 34. Reasonable care under all of those circumstances would require Porter to make some effort to keep abreast of the literature on asbestos. Porter cannot escape that duty because it employed no physicians, nurses, or industrial hygienists on its staff.

Further, there was sufficient evidence from which the jury could have found that a reasonable familiarity with the product would have included awareness of the dangers. Dr. Castleman testified that by 1942 there were many articles about asbestosis within the public domain. To be sure, some of those articles were in obscure publications, and we do not mean to imply that Porter had a duty to discover information presented, for example, in a German medical journal. But Castleman's testimony reflects that there was information available in nonobscure publications, such as the *Encyclopedia Americana* of 1939 or 1940, sufficient to put an installer-supplier on notice of the danger.

Hence Balbos met his burden of proving that Porter had a duty to warn.

## IV

### Eagle's Substantial Factor Causation

Eagle manufactured a powder, containing asbestos, from which to make insulating cement. Eagle argues that there was insufficient evidence of a substantial causal relationship between either decedent's exposure to its product and the fatal mesotheliomas. Evaluation of that argument requires an appreciation of the workplace environments of each decedent.

### A

In 1942–1944 when Balbos was employed at Fairfield as a sheet metal worker, that shipyard was engaged exclusively in building Liberty ships, a World War II cargo vessel. Asbestos products were used for insulation. There was evidence from which the jury could have found the following.

Bethlehem used two insulation contractors at Fairfield, each of which supplied its own materials. One was Reid–Hayden, which later merged into Porter, and the other was Armstrong Cork (Armstrong). Each did the insulation on alternate ships. Eighty percent of the insulation on a Liberty ship was in the engine room, where the boilers, turbines, and myriad runs of pipe had to be covered. The engine room of a Liberty ship was approximately two stories high, with catwalks at the higher level. The length and width of the engine room approximated one-half of the area of a large, ceremonial courtroom. Additional piping had to be insulated in the shaft alley, an enclosed area running aft from the engine room bulkhead to the propeller. The engine room and shaft alley were ventilated by air drawn by fans through large funnels on the deck, and thereafter through sheet metal ducts, into the areas below deck. There were no exhaust systems.

Asbestos was brought into these work areas in the form of blocks, tubing, blankets, cloth, and powder. Dust was

created by sawing, breaking, ripping, crushing, and stirring these products.

The blocks came in three foot lengths, six inch widths, and varying thicknesses. They were used to line the outside of boilers and turbines. To prevent sharp edges and to give the covering a neat appearance the six inch widths were cut lengthwise in half by hand saws. The blocks also had to be cut into wedge-shaped pieces for circular surfaces. Asbestos tubing was used to cover the pipes. Tubing came in three foot lengths, with interior diameters of varying sizes. Viewed cross-sectionally, the tubing was either a circle with a slit or two semi-circles, called "halfrounds." In order to obtain a tight fit it was not uncommon to cut a narrow strip from the length of the tubing to be placed around a pipe. At every elbow, joint, and valve the tubing had to be cut to fit. Insulators working on scaffolding, or on catwalks, or at the bottom of the engine room, would simply let the cut-off scraps and short pieces of block and tubing free fall.

Asbestos blankets and cloth, also used to wrap pipes or otherwise to layer insulation, were usually simply ripped to the desired size.

Powdered asbestos cement was mixed with water to form a coating which was applied over the blocks, tubes, blankets, and cloth in order to fill in all of the crevices and to create a finished appearance. Building a single Liberty ship required 100 bags of asbestos cement, each weighing 100 pounds. Clouds of dust were created when this powder was dumped into mixing tubs or buckets. The wet cement was applied with trowels. Drippings of cement fell and were left to dry where they landed.

Working in, and trooping through, the engine room were other trades, including sheet metal workers, of whom Balbos was one. All of the workers further contributed to creating ambient asbestos dust by crushing underfoot the scraps and dried cement drippings. Even when laborers

cleaned up the work area by shovelling or sweeping the debris, dust was generated.

As a result, all of the workers in the engine room, including not only insulators, but also electricians, pipefitters, riggers, iron worker-erectors, and sheet metal workers, would be covered with a white coating of asbestos dust. Balbos's brother, who also worked at Fairfield and who would regularly meet Balbos for lunch, described Balbos as covered with asbestos dust when they met.

Eagle's asbestos cement contributed to this scene. The product was used by both of the supplier-installers at Fairfield for application to high temperature surfaces. It was applied in layers. After the first layer dried, a second layer was applied until the specified thickness was obtained.

### B

Key Highway, where Knuckles worked, was a very large ship repair yard with the capacity to work on ten to fifteen ships at one time. The repair work involved first ripping out the damaged or otherwise deficient area of the ship to be repaired. The ripping out process generated asbestos dust from the old insulation. Replacement work, particularly in the engine room, required new insulation, and that work proceeded much in the fashion of the insulation of newly constructed ships at Fairfield, described above.

A witness who worked as an acetylene burner at Key Highway continuously from 1946 to 1982 saw Knuckles at work "practically every day." As an erector, Knuckles would hang new plates. This could be done on the outside of the ship, on the keel plates, in the engine room, in the boiler room, and in the shaft housing. Those in Knuckles's trade would erect catwalks and handrails in the engine and boiler rooms and erect the foundations for engines.

A frequent activity in the Key Highway shipyard was rotor inspection which a ship would require approximately every five years. This involved breaking through the asbestos cement and block covering of the main turbine to

remove the cover and, after inspection and any repair, re-insulating the turbine. The witness who had been a burner also described working in the 1970s with Knuckles on two, specifically identified ships, each of which were in the yard for one year. Their sterns were torn out and replaced in order to install new rudders. That same witness additionally recalled working in the 1950s with Knuckles on the conversion of former troop ships which were "completely gutted."

A witness who worked as a pipe coverer at Key Highway for twenty-eight years beginning in 1949 identified Eagle "66" cement as one of the products which he used during that period. Another witness who from 1951 to 1982 operated a forklift delivering asbestos products from a central warehouse at Key Highway to the various ships in the yard described delivering 100 pound bags of Eagle cement to ships in the yard.

## C

Eagle's submission is that neither in *Balbos* nor in *Knuckles* did the plaintiffs produce sufficient evidence to permit a jury to find that Eagle's failure to warn was a proximate cause of the decedents' deaths. Eagle does not dispute, however, that the principle of proximate causation by which the evidence concerning causation in fact is to be determined is the substantial-factor rule, and not the "but-for" rule.

As pointed out in W. Keeton, *Prosser & Keeton on The Law of Torts* § 41, at 266 (5th ed. 1984) (Prosser), "[i]f two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result," some test of proximate causation, other than "but-for" is needed. Accordingly, Restatement (Second) of Torts § 431 states the following rule:

"The actor's negligent conduct is a legal cause of harm to another if

(a) his conduct is a substantial factor in bringing about the harm, and

(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm."

In products liability involving asbestos, where the plaintiff has sufficiently demonstrated both lung disease resulting from exposure to asbestos and that the exposure was to the asbestos products of many different, but identified, suppliers, no supplier enjoys a causation defense solely on the ground that the plaintiff would probably have suffered the same disease from inhaling fibers originating from the products of other suppliers.[11]

Further, in the instant cases, a medical expert for the plaintiffs testified that "all of [the] exposures to asbestos were a significant contributing causal factor to the mesothelioma," because the causation is "cumulative." The defendants' medical expert also believed that a person must reach an undefined "threshold" of asbestos exposure before exposure will cause mesothelioma. Thus, the failure to warn on the part of any one supplier of an asbestos product to which a decedent was exposed can operate as a concurrent proximate cause with the failures to warn on the part of other such suppliers. *See Wehmeier v. UNR Indus.*, 213 Ill.App.3d 6, 157 Ill.Dec. 251, 256, 572 N.E.2d 320, 335 (1991); *Sholtis v. American Cyanamid Co.*, 238 N.J.Super. 8, 568 A.2d 1196, 1205 (1989); *O'Connor v. Raymark Indus.*, 401 Mass. 586, 518 N.E.2d 510, 513 (1988).

■ Eagle's argument that its conduct was not a substantial factor is made on several levels. At the most

---

**11.** Prosser, *supra,* at 268 proposes an alternative formulation of the substantial factor rule, in these terms:

"When the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event."

(Footnote omitted).

primitive level Eagle emphasizes the lack of direct evidence specifically placing either decedent in the immediate area of the use of an Eagle product at the time when that product was being used. Exposure, however, may be established circumstantially. *See Roehling v. National Gypsum Co. Gold Bond Bldg. Products,* 786 F.2d 1225, 1228 (4th Cir. 1986) ("The evidence, circumstantial as it may be, need only establish that [plaintiff] was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled."). The causation question here is whether the evidence and inferences most favorable to the plaintiffs support a finding that exposure to Eagle's products was a substantial factor in the death of each decedent.

■ Neither decedent in the cases before us worked directly with asbestos products; rather, they were bystanders. Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. *See, e.g., Rotondo v. Keene Corp.,* 956 F.2d 436 (3d Cir.1992) [1992 Asbestos Lit.R. (Andrews) 24,745]. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product. *See Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 367–68 (3d Cir.1990); *Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156, 1162–63 (4th Cir.1986); *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482–83 (11th Cir.1985); *Wehmeier v. UNR Indus.,* 157 Ill.Dec. at 256–58, 572 N.E.2d at 335–37; *Eckenrod v. GAF Corp.,* 375 Pa.Super.

187, 544 A.2d 50, 52–53, *alloc. denied,* 520 Pa. 605, 553 A.2d 968 (1988). "In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease." *Lockwood v. AC & S, Inc.,* 109 Wash.2d 235, 744 P.2d 605, 613 (1987).

The way in which the foregoing principles are applied to the facts in the cited cases is informative. In *Blackston,* 764 F.2d 1480, the plaintiff had been a pipefitter for thirty-five years, but the case involved only two years of that period during which the plaintiff worked on the construction of a paper mill in Georgia. The defendant, one of the contractors on that job, used the asbestos product in question, but the plaintiff's evidence "did not show that he was working in the vicinity [where] it was being used." *Id.* at 1481.

*Robertson v. Allied Signal* presented the claims of workers at a tire manufacturing facility where the principal activity took place in a building three levels high with a total area of 862,000 square feet. One of the defendants, Allied Signal, made the asbestos brakes used on certain cutting machines in the stock-cutting area. The trial court had granted summary judgment for Allied Signal. That judgment was reversed as to one plaintiff whose job was to run the mill that supplied the cutters, so that that plaintiff worked in proximity to the cutters for seven years. Judgment for Allied Signal was affirmed as to the other plaintiffs who worked elsewhere in the building.

The size of the tire manufacturing facility in *Robertson* was used to distinguish that case in *Rotondo v. Keene Corp.,* 956 F.2d at 441 [1992 Asbestos Lit R. at 24,750]. Rotondo was a welder at the Philadelphia Naval Shipyard in 1942–43. The defendant manufactured an asbestos pipe covering called "Ehret." In reviewing a judgment for the plaintiff, the Third Circuit applied governing Pennsylvania law, as enunciated in *Eckenrod v. GAF Corp.,* 544 A.2d 50, where

"[t]he court stated that 'a plaintiff must establish more than the presence of asbestos in the workplace; he must

prove that he worked in the vicinity of the product's use.' In particular, a plaintiff must present evidence 'to show that he inhaled asbestos fibers shed by the specific manufacturer's product.' The relevant evidence is 'the frequency of the use of the product and the regularity of the plaintiff's employment in proximity thereto.' "

956 F.2d at 439 [1992 Asbestos Lit.R. at 24,748] (quoting 544 A.2d at 52–53 (citations omitted)).

Those requirements were satisfied in *Rotondo* for the following reasons:

"In summary, the testimony introduced in the instant case did not merely place Ehret pipecovering 'somewhere' in a large facility, but rather placed it in the specific area (i.e., the boiler room) in which Rotondo worked. In addition, the evidence established that Rotondo worked in the boiler room of the *Monticello* at least 2 days a week for at least 3 to 4 months during the summer of 1942, and that the pipecoverers used the Ehret product fifty percent of the time."

956 F.2d at 442 [1992 Asbestos Lit.R. at 24,751].

The facts in the cases before us are quite similar to those in *Roehling v. National Gypsum,* 786 F.2d 1225. The plaintiff was a pipefitter who for six months had worked on the construction of new boilers at the power station of an industrial plant. He did not apply insulation, a task done by asbestos installers who followed behind in the progress of the work. The boiler walls were insulated with asbestos block and then covered with asbestos cement. An insulator-helper testified that " 'tons of' " the defendant's cement were used on the boiler walls. *Id.* at 1227. Summary judgment for the cement supplier was reversed because the facts and underlying inferences established that the plaintiff "worked in the same limited area of the plant, at the same time" as the insulators "working side by side." *Id.* at 1228.

In the cases before us the juries could reasonably find that Eagle's "66" cement was specifically designed for

high temperature surfaces and that, at Fairfield and Key Highway during the respective periods of employment of the decedents, great quantities of "66" were used regularly, thickly to coat the housings of the steam and energy generating units, and the pipes emanating therefrom, in ships which were newly constructed, converted, or repaired.

Further, the jury in *Balbos* could conclude that the engine room was the area of the most dense concentration of asbestos fibers in newly constructed Liberty ships. The jury could further infer from the description of Balbos's being covered regularly with asbestos dust, that he was frequently exposed in the engine room area. In the *Knuckles* case, there is direct evidence placing Knuckles within the engine room area of ships under repair, as well as working on exterior plates. Although Knuckles's exposure in the engine room area of ships to fibers from high temperature asbestos cement may not have been as regular as that of Balbos, the exposure of Knuckles was over a much longer period. Indeed, each decedent had about the same concentration of asbestos fibers in his lung tissue, as determined on autopsy.

Thus, the jury in each case could find that the decedent was frequently exposed to fibers from the Eagle "66" asbestos cement in the proximity of the engine room of ships where that product was regularly used.

V

Porter's Substantial Factor Causation

Porter argues that there was insufficient evidence in *Knuckles* to find that Knuckles was injured by Porter's products or installers. Knuckles presented two theories of liability against Porter: that Porter's employees exposed Knuckles to asbestos fibers during installation of products at the Key Highway shipyard, and that Porter sold to the shipyard Johns–Manville (Manville) asbestos products to which Knuckles was exposed. The Court of Special Ap-

peals affirmed. We shall reverse because of missing links in the chain of causation running from Porter to Knuckles.

The evidence would support finding that Manville products were a substantial factor in causing Knuckles's injury. One witness testified that he frequently worked near Knuckles and that Manville products were used often in their common area during those times. Several other witnesses testified that Manville products were used in areas of ships where Knuckles likely would come in frequent contact with them.

The contact between Knuckles and Manville products, however, is not enough to hold Porter liable. Knuckles also had the burden of proving that Porter was responsible for the Manville products, either as seller to Bethlehem, or because Porter workers used them at Key Highway.

## A

█ To prove that Porter sold the Manville products to Key Highway, Knuckles relies primarily on the testimony of Charles Holterman, a former Porter executive who worked in New Jersey before his assignment to Baltimore in 1982. Holterman said that Porter normally stocked Manville products, but Porter would sell the product of another manufacturer if Porter's customer so requested. "So, insofar as sales were concerned," Holterman thought it fair to say that Porter was "almost an exclusive distributor" for Manville products. This is not evidence that Manville generally sold exclusively through Porter in Baltimore or to Key Highway. Indeed, there was considerable evidence that Manville products could have arrived at Key Highway without going through Porter. For instance, Eugene Bigham testified that Wallace & Gale, another insulation-installing firm, used Manville products at Key Highway. A storeroom clerk at Key Highway testified that at least some Manville products apparently were shipped directly from Manville. Holterman himself testified that Manville "sold material directly to larger concerns."

Further, there was no direct evidence that Porter sold products to Key Highway. While direct evidence is not necessarily required, Knuckles must do something more than show that Porter sold Manville products and that Key Highway purchased Manville products. In *Zenobia,* where the plaintiff testified to exposure to products bearing the label of Anchor, we held as to Anchor's supplier, Raymark, as follows:

"The mere 'conjecture' that half of Anchor's asbestos products may have come from Raymark over a thirty year period is not sufficient to prove that the plaintiff Zenobia was exposed to Raymark's products during the two year period that he worked at Maryland Shipbuilding and Drydock or that Raymark's products were a substantial factor in causing the plaintiff Zenobia's injuries."

*Zenobia,* 325 Md. at 670, 602 A.2d at 1184.

From the evidence reviewed above, the Court of Special Appeals concluded that the jury reasonably could have inferred that "any Johns–Manville products identified at Key Highway were Porter Hayden products." 84 Md.App. at 38, 578 A.2d at 241. We do not agree. Unknown are whether, and to what extent, Porter sold, independently of accompanying installation, asbestos products at Key Highway, whether, and to what extent, Manville sold directly to Key Highway, and whether, and to what extent, other independent contractor-installers brought Manville products to Key Highway to perform their contracts. Absent quantification of these relationships, it is speculation to assume Knuckles's proximity to Manville asbestos at Key Highway is probably proximity to Porter asbestos.

### B

Knuckles's theory that Porter's installers caused his injury also fails. Clearly Porter installers used Manville products. But the sole evidence in the 10,000–page record extract tending to prove that Porter installers were at Key Highway came from Santo Conigliaro, an asbestos worker

employed directly by Bethlehem at Key Highway from 1964 to 1968.

"Q. Okay. Now, during the period 1964, '68, when you worked at Key Highway, did the insulators employed by Bethlehem do all the insulation down there?

"A. Not always. Sometimes we were so busy they had to bring in contractors.

"Q. Do you recollect, sir, the names of any of the contractors that were brought in during that period to do insulation?

"A. Yes.

"Q. Could you tell us that, please, sir?

"A. Armstrong, Porter Hayden, Wallace & Gale."

Other witnesses who were asked to identify independent contractor installers that worked at Key Highway named installers other than Porter.

Because, as we have seen in Part V.A., Knuckles's exposure in proximity to Manville asbestos does not prove Knuckles's exposure to Porter-supplied asbestos, the residuum of proof is that Bethlehem, between 1964 and 1968, "sometimes" used outside installers at Key Highway, one of whom was Porter, and that Knuckles was employed at Key Highway during the same period. This does not establish that Knuckles was frequently exposed in proximity to Porter-supplied asbestos products which were regularly used.

 Knuckles nevertheless contends that the evidence, as we state it, is legally sufficient to impose liability on Porter under the "fiber drift theory." We use the quoted expression in the same sense in which it was explained in *Robertson v. Allied Signal, Inc.,* 914 F.2d at 376.

"The 'fiber drift theory' as it is described by the plaintiffs here takes as its starting point that asbestos fibers may become airborne or re-entrained and thus be carried from their source to other areas. Under this theory, however, both the specific locale of the product's use and the specific areas of the plaintiff's employment become

irrelevant. The substance of the fiber drift theory is that once an asbestos-containing product can be placed *anywhere* in the Firestone plant, any plaintiff working at any point within that plant is entitled to have the question of causation submitted to the jury because it is likely, given that fibers can drift, that a given plaintiff was exposed to fibers originating in a particular defendant's product."

So extremely attenuated is causation in fact under the "fiber drift theory" that it is inconsistent with the requirement of Maryland law that an actor's negligence be a substantial factor in causing the injury. The "fiber drift theory" as we have defined it has been expressly rejected in *Robertson,* 914 F.2d at 382; and *Wehmeier v. UNR Indus.,* 157 Ill.Dec. at 268, 572 N.E.2d at 337; *see also Thacker v. UNR Indus.,* 213 Ill.App.3d 38, 157 Ill.Dec. 272, 274–75, 572 N.E.2d 341, 343–44, *appeal granted,* 141 Ill.2d 562, 162 Ill.Dec. 510, 580 N.E.2d 136 (1991).

Knuckles relies on *Lockwood,* 744 P.2d 605, as supporting the sufficiency of the evidence against Porter. In *Lockwood,* however, the plaintiff, a shipyard worker, at least proved that the defendant's product was used on a particular ship on which the plaintiff worked as a rigger. 744 P.2d at 612–13. We need not opine whether, on the facts of some other case, connecting the plaintiff and the defendant's asbestos product to the same ship during the same repair will satisfy the proximity requirement of substantial factor causation in asbestos disease cases. It is sufficient for present purposes to note that the proof here does not even place Knuckles on the same ship, much less during the same repair, where Porter installers were applying Porter-supplied products.

For the foregoing reasons the judgment in *Knuckles* against Porter must be reversed.

## VI

### Sophisticated User

At trial, defendants sought to present a "sophisticated user" defense, under which suppliers of dangerous or defec-

tive products are not negligent in failing to warn ultimate users of the product because the supplier reasonably relies on an intermediary who redistributes the product to give the warning. The defendants submit that a jury could find that Bethlehem, as intermediary, had knowledge of the product's danger and was in a better position to warn users than were the suppliers.

Judge Marshall A. Levin, on pretrial motion, ruled the sophisticated user defense inapplicable. At trial defendants requested that the jury be instructed on the defense, arguing that the instruction had been generated by evidence admitted on a superseding cause theory. The trial judge, Judge David Ross, refused the instruction. The Court of Special Appeals agreed with Judge Ross, *Balbos*, 84 Md. App. at 59–66, 578 A.2d at 252–55. So do we.

After the Court of Special Appeals decided its *Balbos*, this Court recognized the sophisticated user defense in *Kennedy v. Mobay Corp.*, 325 Md. 385, 601 A.2d 123 (1992), *aff'g* 84 Md.App. 397, 579 A.2d 1191 (1990). We did so for the reasons stated by Chief Judge Wilner in his *Mobay* opinion for the Court of Special Appeals. *Mobay* followed the majority view on sophisticated user that is implied in Restatement (Second) of Torts § 388 & comment *n*. [12] The purpose of the sophisticated user defense is to put some restraints on the expanding liability of manufacturers. "Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do...." *Id.*, comment *n*.

Under the Restatement view a court focuses on the conduct of the *supplier* of the dangerous product, not on the conduct of the intermediary. *See* Note, *Failures to Warn and the Sophisticated User Defense*, 74 Va.L.Rev. 579, 596–604 (1988). Thus, proof that the intermediary knew that the product was dangerous does not, in and of itself, absolve the supplier of a duty to warn ultimate users.

---

**12.** Restatement (Second) of Torts § 388 is set forth in n. 9, *supra*.

Rather, the finder of fact considers a variety of factors in order to determine whether the supplier reasonably relied upon the intermediary to warn users. Those factors include:

"(1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users."

*Mobay*, 84 Md.App. at 405, 579 A.2d at 1195 (quoting *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 557 (W.D.Va.1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985)).

■■■■■■ The sophisticated user defense is not exclusively available to bulk suppliers of products. *See Housand v. Bra–Con Indus.*, 751 F.Supp. 541, 544 (D.Md.1990); *Singleton v. Manitowoc Co.*, 727 F.Supp. 217, 225–26 (D.Md.1989), *aff'd*, 931 F.2d 887 (4th Cir.1991); *Marshall v. H.K. Ferguson Co.*, 623 F.2d 882, 886–87 (4th Cir.1980); *Jacobson v. Colorado Fuel & Iron Corp.*, 409 F.2d 1263, 1272–73 (9th Cir.1969). Clearly, however, the manner in which the product is supplied to an intermediary is an important factor to consider when determining whether the defendant reasonably relied on the intermediary to warn ultimate users of the product. For instance, when a supplier ships silica sand to a factory in railroad car quantities, it has been held reasonable for the supplier to rely on the knowledgeable management of the factory to disseminate warnings to workers because the supplier had little practical opportunity to warn. *Goodbar, supra*, 591 F.Supp. at 566–67; *see Smith v. Walter C. Best, Inc.*, 927 F.2d 736 (3d Cir.1990). On the other hand, if the factory purchased the sand in fifty pound bags that were personally handled by the workers, the balance of factors may favor requiring the supplier to place a warning on the bags.

Usually inquiries into the reasonableness of conduct are the province of the jury rather than of the court. *See Kahlenberg v. Goldstein,* 290 Md. 477, 494–97, 431 A.2d 76, 86–87 (1981) (assumption of the risk); *Menish v. Polinger Co.,* 277 Md. 553, 569, 356 A.2d 233, 241 (1976) (contributory negligence); *Mass Transit Admin. v. Miller,* 271 Md. 256, 259, 315 A.2d 772, 774 (1974) (negligence). In this case, however, Judge Ross properly foreclosed jury consideration of the sophisticated user defense.

The defendants point to no evidence or proffered evidence that their own reliance upon Bethlehem as a conduit of warning was reasonable. What they presented was evidence that Bethlehem knew of the danger of asbestos. Defendants do not set forth any evidence or proffered evidence that they knew that Bethlehem knew of the danger. There was no evidence, for example, that any of the defendants or any other asbestos supplier or installer ever warned Bethlehem about asbestos until the 1960s. To the contrary, defendants argued that during World War II Bethlehem possessed *confidential* information from the government on the dangers of asbestos—information that the suppliers could not have uncovered even if they tried. While this evidence may have been relevant to the defendants' state-of-the-art or superseding-cause defenses, it did not supply the basis for a sophisticated user defense, the focus of which is on the reasonableness of the *supplier's* conduct. To be entitled to a sophisticated user instruction, suppliers, at a minimum, must have introduced evidence that they warned the intermediary of the danger, *see Mobay,* 84 Md.App. at 424, 579 A.2d at 1205, or that they knew a warning was unnecessary because the intermediary was already well aware of the danger, *see Smith v. Walter C. Best, Inc.,* 927 F.2d at 741 (reasonable for suppliers of silica sand to rely on intermediary's knowledge of silicosis because of amount of information available on the disease, regardless of whether suppliers actually assured themselves that intermediary knew of the information). In some cases an intermediary's knowledge may be inferred from

general publicity about the danger, *see id.*, but that inference must also support an inference that the supplier knew of the intermediary's knowledge.

This analysis accords with the position taken in *Willis v. Raymark Indus.*, 905 F.2d 793 (4th Cir.1990). In that case, several plaintiffs sued asbestos manufacturers and suppliers for injuries caused by asbestos exposure incurred while working at a duPont plant. At least one defendant, Celotex, argued for a sophisticated user defense because duPont had extensive knowledge of the dangers of asbestos. *Id.* at 797. The Court disagreed:

> "Celotex's proffer of proof on this issue, however, does not address one critical point: whether Celotex knew the extent of duPont's knowledge during or prior to the period of the plaintiffs' exposure. Celotex may not escape liability by reconstructing the past to show merely what the employer/purchaser knew. Comment n clearly focuses on what the product manufacturer knew and the reasonableness of its reliance on the employer *prior to and during the time the workers were exposed.* Moreover, Celotex offers no evidence that it apprised duPont of the dangers of the insulation or that it attempted to ascertain whether duPont could reasonably be relied upon to disseminate information about the dangers of the product. The fact that an employer possesses knowledge of a product's dangers does not extinguish the manufacturer's liability unless the manufacturer can also show that it had reason to believe that the employer was or would be acting to protect the employees. Celotex has made no such showing here."

*Id.; see also Oman v. Johns–Manville Corp.*, 764 F.2d 224, 233 (4th Cir.) (en banc) (under Virginia law, when burden of warning is not great, failure to give sophisticated user instruction not error when employer was unaware of danger, and after it became aware, did not convey knowledge to employees), *cert. denied*, 474 U.S. 970, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985). Although the Fourth Circuit was applying Virginia law in *Willis* and *Oman*, Virginia uses the

version of sophisticated user implied under Restatement
§ 388(b) and (c) and comment *n*, and we find the reasoning
in those cases to be persuasive.

## VII

### Superseding Cause

■ The defendants next put a superseding cause spin
on their sophisticated user argument. Unlike the sophis-
ticated user defense, a superseding cause defense does not
necessarily require that the supplier warn the intermediary
of the danger or know that, because the intermediary is
already well aware of the danger, a warning is unnecessary.
The focus is on the intermediary's conduct rather than on
the supplier's. Thus, the defendants submit that, even if
they negligently failed to warn, their failures are not sub-
stantial factors in causing the deaths because the jury could
have found that the failure of Bethlehem to warn was a
superseding cause of the deaths. The defendants complain
that the trial judge would not instruct the jury that this
finding was possible under the evidence.[13] The Court of
Special Appeals found no error, and we agree.

---

**13.** The requested instruction read:
"You are instructed that the defendants are not liable to a particu-
lar plaintiff, even if you find them negligent, if there was a su-
perseding cause of Mr. Balbos's or Mr. Knuckles's alleged injuries.
In considering whether defendants' alleged failure to warn under
either of the plaintiff's theories was a substantial factor in causing
Mr. Balbos's or Mr. Knuckles's injuries, you must consider whether
the conduct of their employer, the Bethlehem Steel Corporation,
was a superseding cause of the injury.
"The term 'superseding cause' means an act or omission of a
separate and independent person or agency which was not reason-
ably foreseeable and which destroys the causal connection, if any,
between the alleged original negligence and the injury in question
and thereby becomes the immediate cause of the injury.
"If you find that the Bethlehem Steel Corporation was aware of
any dangers associated with asbestos exposure but failed to take
appropriate steps to protect its employees, including Balbos and
Knuckles, you may find that Bethlehem Steel Corporation's conduct
constituted a superseding cause."

The issue of superseding cause is not even relevant unless the "antecedent negligence is a substantial factor in bringing about" the injury. Restatement (Second) of Torts § 440 (1965).

"On its face, the problem is one of whether the defendant is to be held liable for an injury to which the defendant has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which the defendant is not responsible. In its essence, however, it becomes again a question of the extent of the defendant's original obligation; and once more the problem is not primarily one of causation at all, since it does not arise until cause in fact is established. It is rather one of the policy as to imposing legal responsibility."

Prosser, *supra,* at 301.

"The question is always one of whether the defendant is to be relieved of responsibility, and the defendant's liability superseded, by the subsequent event. In general, this has been determined by asking whether the intervention of the later cause is a significant part of the risk involved in the defendant's conduct, or is so reasonably connected with it that the responsibility should not be terminated. It is therefore said that the defendant is to be held liable if, but only if, the intervening cause is 'foreseeable.'"

*Id.* at 302 (footnote omitted).

Restatement § 452 attempts to define when a negligent failure to prevent harm rises to the level of a superseding cause:

"(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.

"(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause."

*See also id.,* § 447. Comment *d* to § 452 adds that "[s]ubsection (2) covers the exceptional cases in which, because the duty, and hence the entire responsibility for the situation, has been shifted to a third person, the original actor is relieved of liability for the result which follows from the operation of his own negligence." In "exceptional" cases, courts may decide that a negligent failure to prevent harm rises to the level of a superseding cause, but the drafters of the Restatement concede that "[i]t is apparently impossible to state any comprehensive rule as to when such a decision will be made." *Id.,* comment *f.*

■■ An intermediary's negligent failure to prevent harm will be a superseding cause when it is "so extraordinary as to not have been reasonably foreseeable." *Van Buskirk v. Carey Canadian Mines,* 760 F.2d 481, 495 (3d Cir.1985) (quoting *Baker v. Outboard Marine Corp.,* 595 F.2d 176, 184 (3d Cir.1979)); *see* Prosser, *supra,* at 302. Essentially the same standard has been applied in this State. *See State ex rel. Schiller v. Hecht Co.,* 165 Md. 415, 422, 169 A. 311, 313 (1933) (intervening negligence not superseding if a reasonable person "could have anticipated that the intervening act of negligence might, in a natural and ordinary sequence, follow the original act of negligence"); *Segerman v. Jones,* 256 Md. 109, 133–34, 259 A.2d 794, 806 (1969) (student's negligence causing injury to classmate not reasonably foreseeable consequence of teacher's negligent supervision); *Banks v. Iron Hustler Corp.,* 59 Md.App. 408, 428–34, 475 A.2d 1243, 1253–56 (1984); *cf. Atlantic Mut. Ins. Co. v. Kenney,* 323 Md. 116, 127–32, 591 A.2d 507, 512–15 (1991) ("reasonably foreseeable" that driver would pull out around negligently parked truck that was obstructing view of oncoming traffic).

■■ Proving that a third party's failure to warn was a cause superseding, as opposed to operating concurrently with, a defendant's failure to warn is a particularly difficult task in the asbestos products liability cases. *See Adkins v. GAF Corp.,* 923 F.2d 1225, 1231 (6th Cir.1991) (asbestos manufacturer's failure to warn employee not a superseding

cause of failure to warn by supplier from asbestos mine, where supplier was aware of conditions at manufacturer's workplace and same conditions existed at supplier's workplace); *Van Buskirk,* 760 F.2d at 496 (superseding cause instruction not warranted because there was "nothing highly extraordinary in [intermediary's] failure to maintain a safe workplace"); *Hoglund v. Raymark Indus.,* 50 Wash. App. 360, 749 P.2d 164, 170–71 (1987) (government shipyard's failure to warn of asbestos dangers not a superseding cause because the procedures used in handling asbestos were similar or identical to those followed elsewhere), *review denied,* 110 Wash.2d 1008 (1988). In *Van Buskirk,* the court concluded that:

"Where the third party's conduct in question is a failure to prevent harm, even a finding of extraordinary negligence may not in itself warrant a jury instruction, absent other factors supporting a shift in the duty to prevent harm. Unless the trial court determines that there is room for reasonable disagreement regarding foreseeability and duty-shifting, a superseding cause charge should not be given in a situation involving a third party's failure to prevent harm."

760 F.2d at 496 (citation omitted).

The defendants' principal evidence on Bethlehem's knowledge came from Kenneth Nelson, an industrial hygienist for the government during the War, who testified that he contributed to a 1942 study of working conditions at major government contract shipyards. The report issued by Nelson's group recommended that the shipyards take various measures to reduce the dust that workers were exposed to. Nelson testified that Bethlehem would have been made aware of the findings because of "exit interviews" given by team members and because reports of a conference on the subject held in December 1942 and attended by Bethlehem's chief safety engineer were sent to the participating shipyards. Defendants also introduced evidence that from 1939 to 1963 Bethlehem was a member of the Industrial Hygiene Foundation (IHF), which published the *Industrial Hygiene*

*Digest* and distributed it to members. Various excerpts from the IHF digest from 1945 forward discussed the potential hazards of asbestos.

This evidence does not generate a jury issue on superseding cause. There was nothing highly extraordinary in Bethlehem's failure to warn its workers about asbestos. The instant cases deal with ongoing exposure to asbestos, and not with a single, unusual incident. Prior to and during all of Balbos's employment, and prior to and during two decades or more of Knuckles's employment, Bethlehem had not been warning its employees. During that time the installer defendants had not been warning their employees. There was considerable evidence that the suppliers themselves did not believe the early scientific studies concluding that asbestos was hazardous. Hence it was clearly foreseeable, and not even arguably extraordinary, that major users of asbestos such as Bethlehem, who had similar financial reasons to be biased against the early scientific evidence, would likewise disbelieve or otherwise reject that evidence and not warn their employees.

## VIII

### Efficacy of Warning

The defendants present yet another variation on the causation theme. This submission is that the plaintiffs failed to prove that, even if warnings, adequate for the era, had been given, they would have prevented the decedents from incurring the diseases. The defendants argue that they accordingly were entitled to judgment on motion. The proof is said to have failed in two respects: (1) no evidence that warnings would have reached the decedents; and (2) no evidence that the decedents would have heeded any warnings.

The argument is not that the decedents failed to heed warnings actually given, so that, in these negligence cases, decedents were guilty of contributory negligence. Rather, defendants ask us to hypothesize that warnings were given,

and then ask us to contemplate the effects of the hypothetical warnings. The legal justification for this exercise is the proximate cause requirement.

"To establish causation a plaintiff should, in theory, be required to prove not only that she would have read, understood, and remembered the warning, but also that she would have altered her conduct to avoid the injury. How is the plaintiff to carry these burdens? No hard facts or scientific data frame the question. A plaintiff typically can offer little more than self-serving testimony and anecdotal evidence to establish her proximate causation case."

Henderson & Twerski, *Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn*, 65 N.Y.U.L.Rev. 265, 305 (1990) (footnote omitted) (*Doctrinal Collapse*). Here, where the relevant inquiry concerns the reactions of persons now deceased to hypothetical warnings, the proof of causation becomes more difficult or, depending on one's point of view, more unreal.

At least one commentator on this problem has advocated that "[w]here the causal question is not susceptible to any reliable proof whether direct or circumstantial, the proper response seems to be to deny the action in its entirety." R. Epstein, *Modern Products Liability Law* 106 (1980). That has not, however, been the result of the cases, which "pass most causation questions to the jury." *Doctrinal Collapse* at 309.

An apparent majority of courts give plaintiffs the benefit of a presumption that they would have read and heeded a legally adequate warning. *See Butz v. Werner*, 438 N.W.2d 509, 517 (N.D.1989) (collecting cases); 3 *American Law of Products Liability* § 32:74 (3d ed. 1987).[14] Courts do not conclusively so "presume"; rather, they so "pre-

---

**14.** This view has been criticized as an illogical derivative of comment *j* to Restatement (Second) of Torts § 402A (1965). *See Doctrinal Collapse* at 278–79; *contra* Strassfeld, *If . . .: Counterfactuals in the Law*, 60 Geo. Wash.L.Rev. 339, 370 n. 150 (1992).

sume" absent evidence to the contrary. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1281 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank*, 332 N.E.2d 820, 826–27 (Ind.Ct.App.1975), *rev'd on other grounds*, 265 Ind. 457, 358 N.E.2d 974 (1976); *Butz v. Werner*, 438 N.W.2d at 517; *Cunningham v. Charles Pfizer & Co.*, 532 P.2d 1377, 1382 (Okla.1974); *Menard v. Newhall*, 135 Vt. 53, 373 A.2d 505 (1977); 3 *American Law of Products Liability* § 32:74 (3d ed. 1987).

A growing minority of courts refuse to declare a "presumption" but nevertheless affirm jury verdicts for plaintiffs on the theory that the jury reasonably could have inferred from the evidence that the plaintiff would have heeded a warning. *Raney v. Owens–Illinois, Inc.*, 897 F.2d 94, 95–96 (2d Cir.1990) (applying New York law); *Skonberg v. Owens–Corning Fiberglas Corp.*, 215 Ill.App.3d 735, 159 Ill.Dec. 359, 363–64, 576 N.E.2d 28, 32–33, *appeal denied*, 141 Ill.2d 561, 162 Ill.Dec. 509, 580 N.E.2d 135 (1991). In practice, courts adopting this "reasonable-inference" or "fact-intensive" view have not required a great deal of evidence in order for an asbestos-case plaintiff to get to the jury.

This Court has long recognized what has been labeled, perhaps unfortunately, as a presumption that persons exercise ordinary care for their own safety. *See Nizer v. Phelps*, 252 Md. 185, 205, 249 A.2d 112, 123 (1969); *Baltimore Transit Co. v. State ex rel. Castranda*, 194 Md. 421, 434, 71 A.2d 442, 447 (1950); *State ex rel. Pachmayr v. Baltimore & O.R.R.*, 157 Md. 256, 262, 145 A. 611, 613–14 (1929); *Lozzi v. Pennsylvania R.R.*, 152 Md. 508, 510, 137 A. 293, 293 (1927); *Baltimore & O.R.R. v. Stumpf*, 97 Md. 78, 91, 54 A. 978, 980 (1903); *Tucker v. State ex rel. Johnson*, 89 Md. 471, 480, 43 A. 778, 781 (1899). The presumption of due care arises from "the natural instinct of human beings to guard against danger," *Castranda*, 194 Md. at 434, 71 A.2d at 447, which has also been described as

"the known and ordinary disposition" of persons to guard themselves against danger, *Tucker*, 89 Md. at 480, 43 A. at 781.

■ Applying this Maryland concept to the instant asbestos products litigation means that direct evidence that plaintiffs' decedents would have heeded adequate warnings was not an essential element of the plaintiffs' case. The Maryland "presumption" at a minimum means that jurors are entitled to bring to their deliberations their knowledge of the "natural instinct" and "disposition" of persons to guard themselves against danger.

In the smattering of cases where the argument has been made that a plaintiff would not have heeded a warning, if given, the argument has been based on particular evidence bearing on the characteristics of the specific person who was injured. *See Raney*, 897 F.2d 94 and *Skonberg*, 159 Ill.Dec. 359, 576 N.E.2d 28. Those arguments were unsuccessful. Here there was no evidence that the personalities or dispositions of the particular decedents were such that they clearly would have ignored warnings.

■ The other prong of the defendants' causation argument looks not to the particular decedents but to whether the hypothetical warnings would have been communicated to the decedents, who were not direct users of the asbestos products. There was evidence, for example, that Eagle placed caution notices on packages of its cement beginning in 1964, and that safety measures regarding asbestos dust were not enforced by Bethlehem as a matter of management policy until sometime in the 1970s when government inspectors required compliance with occupational health laws. Defendants argue that if the insulators did not wear respirators after warnings were placed on products or product containers, bystanders would have no way of learning, as a result of the warning, that there was a hazard. That evidence does not require judgment on motion for the defendants. The hypothetical causation scenario contemplates all defendant suppliers having given warnings, and having done so beginning more than two decades before 1964.

All of the facts and inferences were submitted to the jury, which was instructed that "if a warning would not have prevented the harm from occurring then a defendant who failed to warn is not responsible because the absence of warning could not have been or would not have been a cause of the injury." The jury concluded that a warning would have been efficacious. When dealing, necessarily, with hypotheticals, we cannot say that that conclusion was impermissible as a matter of law.

## IX

### Sequence of Negligence and Cause

We have seen that Bethlehem's failure to warn was not a superseding cause as a matter of law. We have also seen that the possibility of heedlessness on the decedents' parts is not, as a matter of law, a superseding cause. Now, Eagle presents the ultimate causation argument— that there came a time when the decedents would have died from mesothelioma in any event, even if Eagle thereafter gave warnings. Eagle's theory here is that once the decedents' diseases became terminal, any continuing duty of Eagle to warn could not operate as a cause, so that state of the art evidence after that date is irrelevant. From the standpoint of preservation for appellate review, the vehicle for Eagle's argument is the denial of a requested instruction limiting the jury's use of state of the art evidence.[15]

During trial, the court instructed the jury not to consider the state of the art after 1944 in determining the

---

**15.** Eagle particularizes the prejudice to certain minutes of an asbestos industry institute. When they were introduced, Eagle's general objection was overruled. Eagle specifically briefed that ruling in the Court of Special Appeals, but was unsuccessful. *Balbos,* 84 Md.App. at 92–98, 578 A.2d at 269–71. Eagle did not include the allegedly erroneous ruling as an issue in its petition for certiorari. Therefore, the issue is not before this Court.

Owens, in an amicus brief, does address the issue. But, "[a]s a general rule, we will not consider an issue raised by an amicus when no party to the case raises it." *Maryland–National Capital Park &*

defendants' liability to Balbos. At the conclusion of the evidence the court declined to give the following instruction:

"In determining whether any defendant breached [a] duty to warn you must consider what a reasonable manufacturer or supplier of a particular asbestos product should have provided in terms of warnings and precautions in view of the hazard at and before the time of the plaintiffs' last mesothelioma-producing asbestos exposure."

Eagle argues that the above instruction should have been given in both *Balbos* and *Knuckles*. There was no reversible error.

At first blush the requested instruction appears to do no more than what the court had instructed during trial, name-

---

*Planning Comm'n v. Crawford,* 307 Md. 1, 15 n. 6, 511 A.2d 1079, 1086 n. 6 (1986). The reason is that we ordinarily do not give advisory opinions.

This case is, perhaps, unusual in that the petition by Owens for leave to file a brief amicus recites that it wishes to brief a point—the relevance of the minutes—that Eagle might not present (if a bankruptcy court would not authorize Eagle's appeal).

The minutes were not admitted against Owens at trial because Owens did not have notice of or attend the deposition at which the minutes were authenticated. Consequently, Owens has no standing directly to obtain review of the ruling. Nevertheless, Owens seeks an opinion, necessarily advisory in nature, that its duty as a manufacturer does not encompass learning the content of minutes to which it was not routinely given access.

It is not an advisory opinion to point out that we have already decided the principle that determines the admissibility against Owens of evidence such as the institute minutes. In *Zenobia* we referred with approval to *Dartez v. Fibreboard Corp.,* 765 F.2d 456 (5th Cir. 1985) and *Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d 1076 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), for the proposition:

"Because manufacturers are held to the standards and knowledge of an expert, this evidence is relevant to show what was scientifically and medically available and discoverable by other experts in the field."

*Zenobia,* 325 Md. at 445, 601 A.2d at 645. What is available to be known, in the sense that it is known by other experts in the field, is not *per se* irrelevant to what should be known by a manufacturer in a negligent failure to warn case.

ly, that the jury should not consider state of the art evidence after the employee's exposure to asbestos had terminated by leaving shipyard employment. Eagle now emphasizes the words, "last mesothelioma-producing asbestos exposure," in the requested instruction and reads much more into it. Eagle says that the jury could work backwards from the date of each decedent's death, or from the date when mesothelioma was first diagnosed in each decedent, to a date of onset of that decedent's mesothelioma. This onset date can be computed, Eagle says, from the expert witnesses' "virtual consensus" on the latency period of the disease. Brief of Petitioner Eagle at 32. Further, Eagle argues that there was no evidence that there is any beneficial treatment for mesothelioma. Consequently, Eagle submits, it could not have any duty to warn that continued after the onset date, thus rendering irrelevant any post-onset state of the art evidence. Because such evidence was admitted and its consideration on the issue of negligence was not limited, Eagle submits that it was prejudiced.

The short answer is that the requested instruction is defective because the words, "last mesothelioma-producing asbestos exposure," do not adequately convey to the jurors what Eagle wanted the jurors to do. There was conflicting evidence on the length of the latency period. An expert called by the plaintiffs testified that the average was thirty to forty years, and the minimum was about fifteen years, although a seven-year latency period had been reported. That same expert also testified that time was not the only factor.

> "The two components that have been formulated as being significant in helping to explain how mesothelioma develops in its relationship to asbestos are, number one, there appears to be a linear relationship to the dose, to the burden that is in the lung, and number two that there is a relationship that is really geometric and depends on the length of time since the first exposure. That appears to be the more powerful of the two associations."

A second plaintiffs' expert testified that twenty years was the normal minimum latency but that "[w]e can see them at nine and thirteen years but they're not common." A third expert, called by the defendants, testified that any asbestos exposure Knuckles suffered during the twenty years prior to his diagnosis in 1984 probably would not have been responsible for the development of the mesothelioma that killed Knuckles. The requested instruction does not advise the jury to resolve that factual conflict about the length of the latency period and then to convert it to an onset date in order to exclude from consideration state of the art after the onset date.

In addition, the court properly instructed the jury that the defendants' negligent conduct had to cause the plaintiffs' injuries. These instructions did not preclude the defendants from arguing that the state of the art during Knuckles's latency should not be considered, and counsel for one of the defendants did exactly that. The trial court did not abuse its discretion in giving only a general instruction within which defendants could make their argument on this complex issue. *See Aronstamn v. Coffey,* 259 Md. 47, 51, 267 A.2d 741, 743 (1970) (not reversible error to refuse to give specific instructions where the "instructions as given were broad enough to permit counsel to fit proper arguments within them").

## X

### Punitive Damages

#### A

This Court also granted Knuckles's petition for certiorari on the issue of punitive damages. The Court of Special Appeals had reversed jury awards of punitive damages against Owens and Eagle on the ground that the evidence did not support a finding of implied malice.

In *Zenobia* we held that, in order to obtain punitive damages in a nonintentional tort case, a plaintiff must prove that the defendant acted with "actual malice" rather

than implied malice, 325 Md. at 460, 601 A.2d at 652. We noted in *Zenobia* that the concept of actual malice "does not translate easily into products liability cases." *Id.*, 601 A.2d at 653. *Zenobia* defined "actual malice" in a products liability action as: "(1) actual knowledge of the defect on the part of the defendant, and (2) the defendant's conscious or deliberate disregard of the foreseeable harm resulting from the defect." *Id.* at 462, 601 A.2d at 653. "Actual knowledge" does not mean "constructive knowledge" or "substantial knowledge" or "should have known." *Id.* Instead the plaintiff must show a "bad faith decision by the defendant," made "in conscious or deliberate disregard of the threat to the safety of the consumer." *Id.* at 463, 601 A.2d at 654. This standard looks to the state of mind of the defendant.

We also held in *Zenobia* that the plaintiff must prove actual malice by clear and convincing evidence rather than by a preponderance of the evidence. *Id.* at 469, 601 A.2d at 657.

Both aspects of the *Zenobia* punitive damages rule are applicable to the instant appeal. *Id.* at 470–71, 601 A.2d at 658. We recognized in *Zenobia* that the clear and convincing standard was a change in the law. *Id.* at 469, 601 A.2d at 657. The "actual" malice standard, as explained in *Zenobia*, was also the first articulation by this Court of a test for punitive damages in products liability cases. Under these circumstances, we exercise our discretion under Maryland Rule 8–604(d)(1) to remand this action on the claim of Knuckles against Owens and Eagle for a new trial on the issue of whether, and if so, what amount of, punitive damages should be awarded. At that limited new trial the standards under *Zenobia* will be applied.

### B

 The foregoing ruling means that we have rejected the constitutionally based argument of Owens and Eagle that the awards of punitive damages against either of them

violate that party's right to due process of law by subjecting it to multiple punishments for the same alleged wrong. Eagle raised the issue in this case by a motion to dismiss the claims for punitive damages. That motion was supported by documents evidencing the entry of a judgment for punitive damages in the amount of $10,000 against Eagle in February 1989 in an action in the United States District Court for the Southern District of New York. Eagle's motion in the matter before us was denied by the circuit court.

Owens raised the same issue in its motion for reconsideration of the denial of its motion for judgment notwithstanding the verdict on the issue of punitive damages. The circuit court denied that motion. When Owens filed its brief on the issue of punitive damages in this Court, it also filed here a motion to remand in order to take evidence which allegedly would demonstrate that, after judgment was entered in the circuit court, Owens paid a judgment for $800,000 for punitive damages in an action in the United States District Court for the Southern District of New York based upon the same alleged wrong.

The theory by which this contention is said to rise to the constitutional level was explained in *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277 (2d Cir.), *cert. dismissed,* —— U.S. ——, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990). The contention "assumes that the fact-finder making the first award understood its assignment to be the selection of that sum of money appropriate to punish the tort-feasor for the full extent of its wrongful conduct, not merely a sum appropriate as punishment for the injuries to the plaintiffs in the lawsuit." *Id.* at 280. Here, in the materials furnished in support of their respective motions, the moving defendants did not demonstrate the foundation for that argument. *See also Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085, 1096–97 (5th Cir.1991) ("There is no principle in law limiting recovery of punitive damages to the first claimant."); *Juzwin v. Amtorg Trading Corp.*, 718 F.Supp. 1233, *modifying* 705 F.Supp. 1053 (D.N.J.1989). Further, we have said

that we will not impose on trial courts the "onerous burden" of conducting "complicated evidentiary proceedings to determine if the defendant ha[s] in fact satisfied" a prior punitive judgment award. *Zenobia,* 325 Md. at 473 n. 29, 601 A.2d at 659 n. 29. We accordingly reject the arguments of Owens and Eagle on this point, and we hereby deny Owens's motion filed in this Court.

## C

Owens argues that any award of punitive damages would violate its right to due process because the Maryland standards for calculating the amount of punitive damages give no guidance regarding the appropriate amount of punishment, either to the jury or for purposes of trial court or appellate review. Because we have applied the *Zenobia* standards in reviewing the instant award against Owens, it is not necessary to decide whether the Maryland system of awarding punitive damages might have permitted an unconstitutional result when the instant matter was tried. We hold simply that, under *Zenobia,* the Maryland system for awarding punitive damages is not *per se* violative of due process. *See Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART.

CASE REMANDED TO THE COURT OF SPECIAL APPEALS FOR THE ENTRY OF AN ORDER

(1) REMANDING IN PART TO THE CIRCUIT COURT FOR BALTIMORE CITY AND DIRECTING THE CIRCUIT COURT FOR BALTIMORE CITY

(A) TO ENTER JUDGMENT IN FAVOR OF THE DEFENDANT, PORTER HAYDEN COMPANY, AS TO THE CLAIM OF THE PLAINTIFF, LUCILLE KILLIAN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SUTTON KNUCKLES, AND

(B) TO CONDUCT FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION ON THE CLAIM OF

LUCILLE KILLIAN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SUTTON KNUCKLES, AS TO PUNITIVE DAMAGES AGAINST THE DEFENDANTS, OWENS–ILLINOIS, INC. AND EAGLE–PICHER INDUSTRIES, INC.; AND

(2) OTHERWISE AFFIRMING THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IN ALL RESPECTS.

COSTS OF ALL PARTIES IN THIS COURT TO BE PAID FIFTY PERCENT BY ACandS, INC., OWENS–ILLINOIS, INC., AND PITTSBURGH CORNING CORPORATION, TWENTY–FIVE PERCENT BY EAGLE–PICHER INDUSTRIES, INC., TEN PERCENT BY PORTER HAYDEN COMPANY, AND FIFTEEN PERCENT BY LUCILLE KILLIAN, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SUTTON KNUCKLES.

CHASANOW, J., concurs in the result only.