923 F.2d 1225
 Prod.Liab.Rep.(CCH)P 12,710
Curtis ADKINS and Mary Adkins, his wife,
Plaintiffs-Appellees (89-3537), Cross Appellants (89-3538),
v.
GAF CORPORATION, et al., Defendants,
Asbestos Corporation, Ltd., Defendant-Appellant (89-3537),
Cross Appellee (89-3538).
 Nos. 89-3537, 89-3538.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 13, 1990.
Decided Jan. 23, 1991.
Rehearing Denied Feb. 21, 1991.
 
 M. Catherine Lacinak, Kircher & Phalen, Scott E. Knox, Adams, Thienhaus & Knox, Cincinnati, Ohio, Robert L. Jennings, Jr. (argued), Henderson & Goldberg, Pittsburgh, Pa., for Curtis & Mary Adkins.
 Michael D. Eagen, Bloom & Greene, Cincinnati, Ohio, for GAF Corp. and Carey Canada, Inc.
 Jane E. Garfinkel (argued), John T. Sunderland, Sandra P. Kaltman, Thompson, Hine & Flory, Cincinnati, Ohio, for Asbestos Corp., Ltd.
 Before KRUPANSKY, GUY and SUHRHEINRICH, Circuit Judges.
 KRUPANSKY, Circuit Judge.
 
 
 1
 This appeal by the defendant-appellant Asbestos Corporation, Ltd. (ACL) follows a judgment and award of damages to the plaintiffs-appellees Curtis Adkins and Mary Adkins (Adkins). The stock of ACL is owned by a Canadian crown corporation, and, thus, ACL is an instrumentality of a foreign government and not subject to jury trials in the United States. 28 U.S.C. Sec. 1603; 28 U.S.C. Sec. 1330. Since various claims were submitted to the jury with respect to the other defendants-appellees who were subject to jury trials, the trial court decided to submit all issues with respect to ACL to the jury on an advisory basis. The jury returned a special verdict in favor of Adkins and against ACL. The trial court adopted the advisory jury's verdict and entered its findings of fact and conclusions of law. It also adopted, without elaboration, the advisory jury's damages award. For the reasons that follow, we affirm the trial court's determination of ACL's liability, but vacate and remand the damages award for findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).
 
 I.
 
 2
 The trial court made the following findings of fact, which are reported in Adkins v. GAF Corp., 706 F.Supp. 559 (S.D. Ohio 1988).
 
 
 3
 ACL mines chrysotile asbestos, which is a naturally occurring fibrous mineral. It is mined from rock formations and then crushed, processed and packaged for resale to users. The chrysotile asbestos sold by ACL is processed raw asbestos.
 
 
 4
 From at least 1945, it was general knowledge in the State of Ohio that asbestos exposure causes asbestosis, which is an interstitial lung disease involving primarily the parenchyma of the lung. At all times relevant to this case, asbestos use in Ohio was regulated by the Ohio Department of Health's Legal Requirements for the Prevention and Control of Industrial Health Hazards, which specified a maximum allowable concentration for exposure to dust containing asbestos fiber. Regulation 247 of the Legal Requirements for the Prevention and Control of Industrial Public Health Hazards expressly stated that the maximum allowable concentration for asbestos exposure in Ohio was five million particles of dust containing asbestos per cubic foot of air ("5MPPCF") or below for an eight hour period. This level of asbestos is not visible to the naked eye. Pursuant to the 1946 Ohio regulations, asbestos exposure levels in workplaces were to be measured in the so-called "breathing zone" of the worker, which is the immediate cubic area around the head and face of the worker. At all times relevant to this case, it was the prevailing scientific and medical opinion that asbestos could be used safely for its ordinary and intended industrial applications if limitations on exposure were observed.
 
 
 5
 Prior to 1951, the mining companies located in Thetford Mines, including ACL, funded a medical clinic known as the Thetford Industrial Clinic and hired Dr. Paul Cartier as its director. During his tenure at the clinic, Dr. Cartier was engaged in medical research on asbestos related diseases. As director of the clinic, Dr. Cartier participated in meetings of the leading doctors, scientists and industrial hygienists on the subject of asbestos and asbestos related diseases. From 1949 until the mid-1970s, Dr. Cartier published articles on asbestos in widely distributed medical journals. ACL was aware of Dr. Cartier's activities and of his findings regarding asbestos related diseases. Some of Dr. Cartier's research was conducted on ACL's own mining employees. In addition, based on the available medical and scientific evidence in the 1940s, 1950s, 1960s and 1970s, exposure to asbestos fiber in certain concentrations was known by the defendants to cause asbestosis.
 
 
 6
 In 1951, Mr. Adkins began his employment at the Celotex plant in Lockland where he worked until 1987. Celotex manufactures products used in the construction industry. Many of its products, such as cement, millboard, cement board, insulation, shingles, and roofing paper, contained asbestos. During his employment he worked at different jobs, including positions in the cement plant, the felt mill, and the plant house. He also unloaded railroad cars which transported ACL's processed asbestos fiber in burlap or paper bags to Celotex. While he worked at Celotex, asbestos containing dust was visible in the air of his breathing zone, including the interior of the railroad cars. As an exposure level of 5MPPCF (5,000,000) of air is not visible to the naked eye, where heavy dust concentrations are visible, fiber exposure may be as high as eight hundred million (800,000,000) fibers per cubic foot. At no time did Celotex or ACL specifically advise Mr. Adkins that asbestos could be hazardous to his health. One of the suppliers of asbestos fiber to the Celotex plant was ACL. Other suppliers were Johns-Manville, GAF, and Carey Canadian Mines. The latter supplied approximately 50 percent of the raw asbestos fiber used by Celotex at the plant.
 
 
 7
 During the 1950s and 1960s, processed raw asbestos fiber was sold by the mining companies in burlap and paper bags. All the mining companies sold raw asbestos fiber in the same manner. At all time relevant to this case, ACL gave no warning of any kind on its bags of processed raw asbestos fiber or otherwise that excessive exposure to asbestos fiber caused asbestosis. In addition, ACL knew in detail how the Celotex Lockland plant was operated. Its sales personnel visited the Celotex plant once every two months for years.
 
 
 8
 Mr. Adkins, who smoked cigarettes from 1962-1982, has asbestosis. He was exposed to processed asbestos fibers sold by ACL to Celotex during his employment at Celotex.
 
 
 9
 ACL presents three arguments on appeal. First, that the trial judge improperly applied principles of strict liability. Second, that it is not subject to negligence liability because Celotex knew of the hazards associated with asbestos and because Celotex failed to maintain a safe workplace for its employees. And finally, that the damages award is excessive and unsupported by the evidence.
 
 II.
 A.
 
 10
 ACL claims that the trial judge improperly based its imposition of strict liability upon ACL's failure to warn of asbestos's dangerous qualities and upon its defective packaging of asbestos. ACL also claims that raw asbestos fiber, as a natural substance, cannot be considered a defectively designed "product" for purposes of strict liability.
 
 
 11
 The trial court applied the consumer-expectation test in determining that ACL was strictly liable for the design defect in the processed asbestos. The court stated that the "asbestos product sold by ACL to the Celotex Lockland facility during the period of Mr. Adkins' employment was in a defective condition unreasonably dangerous in that it was more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." 706 F.Supp. at 564. Ohio recognizes that product defects may be proven by applying the consumer-expectation standard. State Farm Fire & Casualty Co. v. Chrysler Corp., 37 Ohio St.3d 1, 523 N.E.2d 489 (1988); Temple v. Wean United, Inc., 50 Ohio St.2d 317, 364 N.E.2d 267 (1977) (adopting section 402A of the Restatement (Second) of Torts (1965)).
 
 
 12
 The trial court correctly noted that ACL could not be held strictly liable based upon the failure to warn. However, the failure to warn, as well as the defective packaging, were part of "the totality of the circumstances which make [the] product defective." 706 F.Supp. at 565. The presence or absence of a warning is a factor to consider when evaluating what an ordinary consumer would expect when using the product. Leichtamer v. American Motors Corp., 67 Ohio St.2d 456, 424 N.E.2d 568, 578 (1981) (noting that comment j to section 402A of the Restatement provides that a warning or directions as to the use of a product may prevent it from being unreasonably dangerous); Krosky v. Ohio Edison Co., 20 Ohio App.3d 10, 484 N.E.2d 704 (1984) (failure to provide warning of dangerous condition is defect which is unreasonable and gives rise to strict liability cause of action).[1] The packaging of a product is also an element to consider when determining whether the consumer would reasonably expect the content of the package to pose the danger it did. See, e.g., Leichtamer, 67 Ohio St.2d at 464, 424 N.E.2d at 578 (the admission of television commercials was highly relevant to the formulation of consumers' expectations of safety and intended use). Thus, the court was correct in considering these factors in evaluating the totality of the circumstances from which the consumers' expectation would have been formed. Knitz v. Minster Machine Co., 69 Ohio St.2d 460, 432 N.E.2d 814, cert. denied, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982).
 
 
 13
 The asbestos sold by ACL was clearly a product for purposes of strict liability. Strict liability extends "to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate consumer or user." Restatement (Second) of Torts Sec. 402A comment d. Comment e to section 402A notes that although strict liability under section 402A normally will be applied to processed materials, "since there is little in the way of consumer products which will reach the consumer without such processing," the scope of section 402A "is not so limited, and the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to the liability here stated." Thus, asbestos fiber which had been extracted from rock, processed, and packaged, was clearly a product within the definition of section 402A. See Neal v. Carey Canadian Mines, Ltd., 548 F.Supp. 357, 372 (E.D.Pa.1982), aff'd sub nom, Van Buskirk v. Carey Canadian mines, Ltd., 760 F.2d 481 (3rd Cir.1985). Liability was premised on ACL's role as the supplier of a product to the consumer and, as noted above, the design defect was shown by the failure of the product to meet the consumer-expectation standard.
 
 B.
 
 14
 The trial court concluded that ACL was negligent because it packaged the processed raw asbestos fiber in burlap/paper bags which carried no warning of its dangerous propensities. The trial court stated that the sale of this product to Celotex, "where Celotex has full knowledge of the hazards associated with use of the asbestos fiber, does not protect ACL from strict products liability to users of its product." 706 F.Supp. at 565. The court asserted that Celotex's "disregard of accepted industrial hygiene standards which were intended to protect workers from unsafe levels of asbestos constitutes negligence; this negligence combined with the conduct of ACL to directly and proximately cause injury to plaintiffs." Id.
 
 
 15
 ACL contends that it was relieved of its duty to warn by selling the asbestos to a "sophisticated user," Celotex, which had full knowledge of the dangers associated with the use of asbestos and which could be relied upon to take the appropriate precautions. According to ACL, even if the sophisticated user defense did not protect it from strict liability to users of the product, it should have protected it from negligence liability. Finally, ACL claims Celotex's conduct did not combine with its own conduct to proximately cause Adkins's injury. Rather, ACL contends it is relieved of liability by the independent, unforeseeable failure of Celotex to maintain a safe workplace for its employees.
 
 
 16
 Although ACL is correct in maintaining that the sophisticated user defense is available against a negligence claim, the defense is to no avail to ACL in this action. The sophisticated user defense is based on comment n to section 388 of the Restatement (Second) of Torts. Section 388 provides:
 
 
 17
 One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
 
 
 18
 (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
 
 
 19
 (b) has no reason to believe that that those for whose use the chattel is supplied will realize its dangerous condition, and(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
 
 
 20
 Restatement (Second) of Torts Sec. 388 (1965).
 
 
 21
 Comment n to section 388 states that the supplier's duty to warn may be discharged by providing information about the product's dangerous propensities to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who may be exposed to its hazardous effects. In addition, comment n to section 388 states:
 
 
 22
 Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it....
 
 
 23
 ....
 
 
 24
 Here, as in every case which involves the determination of the precautions which must be taken to satisfy the requirements of reasonable care, the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them, ... and the magnitude of the risk is determined not only by the chance that some harm may result but also the serious or trivial character of the harm which is likely to result....
 
 
 25
 ....
 
 
 26
 Thus, while it may be proper to permit a supplier to assume that one through whom he supplies a chattel which is only slightly dangerous will communicate the information given him to those who are to use it unless he knows that the other is careless, it may be improper to trust the conveyance of the necessary information of the actual character of a highly dangerous article to a third person of whose character he knows nothing. It may well be that [the supplier] should take the risk that this information may not be communicated, unless he exercises reasonable care to ascertain the character of the third person, or unless from previous experience with him or from the excellence of his reputation the supplier has positive reason to believe that he is careful. In addition to this, if the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful.
 
 
 27
 Restatement (Second) of Torts Sec. 388 comment n.
 
 
 28
 As noted by this circuit in Adams v. Union Carbide Corp., 737 F.2d 1453, 1457 (6th Cir.), cert. denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), the pivotal inquiry in determining whether this defense is available is a fact-specific evaluation of the reasonableness of the supplier's reliance on the third party to provide the warning. See Dougherty v. Hooker Chemical Corp., 540 F.2d 174, 177 (3rd Cir.1976).
 
 
 29
 In Adams, Union Carbide supplied the toxic chemical toluene diisocyanate (TDI) to the General Motors Corporation (GMC), whose employees were exposed to TDI's hazardous vapors during their work at GMC's plant. When Adams, a GMC employee, became disabled from exposure to the vapors, she claimed that GMC had negligently failed to warn GMC and its employees of the dangers of TDI. In arriving at its conclusion that Union Carbide had discharged its duty to warn, the court relied upon the following factors: Union Carbide repeatedly supplied GMC with comprehensive information about the hazards of the chemical, information for dissemination to the GMC employees; Union Carbide provided instructions to GMC officials designed to limit employee exposure to the chemical; and Union Carbide was unable to label any TDI container noting content hazards since the chemical was shipped in bulk and transferred from truck tanks or rail tank cars directly into GMC storage tanks. Adams, 737 F.2d at 1454, 1456-57. These facts, coupled with GMC's duty to provide its employees a safe place to work, supported the conclusion that Union Carbide reasonably relied upon GMC to convey the Union Carbide information to GMC employees. Adams, 737 F.2d at 1457. Thus, Union Carbide had exercised reasonable care within the context of section 388 and was not negligent.
 
 
 30
 Unlike Union Carbide, ACL has presented no evidence to suggest that it supplied warnings to Celotex. Second, unlike Union Carbide, ACL was not precluded by the packaging of asbestos from directly conveying a warning to Celotex's employees. More importantly, ACL was familiar with the operation of the Celotex facility. ACL's sales representatives visited the installation once every two months for years. ACL had firsthand information concerning the scope and magnitude of employee exposure to asbestos at the Celotex factory. Since Dr. Cartier's research was performed on ACL's own mining employees, ACL knew how its employees were contracting asbestosis and, from its knowledge of the Celotex plant, would know exactly how the Celotex employees were not being protected. This actual knowledge of ACL belies any claim of reasonable reliance upon the supposition that since Celotex knew of the hazards of asbestos, it would warn its employees.
 
 
 31
 ACL's knowledge of the hazardous operation of the Celotex plant also defeats its claim that Celotex's negligence was the superseding, intervening cause of Adkins's injury. The determination of whether an intervening act disrupts the casual connection between the initial negligent act and the injury turns upon "whether that intervening actor was a conscious and responsible agency which could have or should have eliminated the hazard, and whether the intervening cause was reasonably foreseeable by the one who was guilty of the negligence." Cascone v. Herb Kay Co., 6 Ohio St.3d 155, 159, 451 N.E.2d 815, 819 (1983). Under Ohio law, this issue of proximate cause is a factual issue. Drayton v. Jiffee Chemical Corp., 591 F.2d 352, 360 (6th Cir.1978); Gedeon v. East Ohio Gas Co., 128 Ohio St. 335, 190 N.E. 924 (1934).
 
 
 32
 The record amply supports the trial court's determination that Celotex's negligence combined with ACL's negligence to proximately cause Adkins's injury. ACL knew how the Celotex plant was operated. Thus, Celotex's failure to warn its employees and provide safe working conditions were either known to ACL or foreseeable by ACL at the time it sold its products to Celotex. In fact, since substantially similar working conditions existed at ACL's mines, there was nothing extraordinary or unforeseeable about Celotex's failure to maintain a safe working place. See, e.g., Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 496-97 (3rd Cir.1985), aff'g sub nom, Neal v. Carey Canadian Mines, Ltd., 548 F.Supp. 357 (E.D.Pa.1982). Since Celotex's negligence was foreseeable by ACL, that negligence was not an intervening, superseding cause of Adkins's injury and does not relieve ACL of liability.
 
 C.
 
 33
 ACL challenges the damages award entered on the strict liability claim to Curtis and Mary Adkins.[2] ACL contends that the damages award entered against it is highly excessive in relation to the evidence of damages presented, that the award for loss of earnings was not reduced to its present value, Maus v. New York, Chicago & St. Louis Rd. Co., 165 Ohio St. 281, 285, 135 N.E.2d 253, 256 (1956); Rodgers v. Fisher Body Division, G.M.C., 739 F.2d 1102, 1106 (6th Cir.1984), cert. denied, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 821 (1985), and that the large size of the award is attributable to opposing counsel's inflammatory remarks during closing argument.
 
 
 34
 "In determining whether a verdict is so excessive that appellate review is proper, the Court must find the verdict to be 'shocking' or to manifest 'plain injustice.' " Rodgers, 739 F.2d at 1106. Before a verdict is reversed because it is excessive, the court must make a detailed appraisal of the evidence bearing on damages. Id. (citing Grunenthal v. Long Island R. Co., 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968)). In addition, the verdict below is entitled to considerable deference, and judgments supported by some competent, credible evidence going to all the essential elements of an award will not be reversed by a reviewing court as against the manifest weight of the evidence. See Shore, Shirley & Co. v. Kelley, 40 Ohio App.3d 10, 531 N.E.2d 333 (1988).
 
 
 35
 The trial court based its damages award upon the advisory jury's verdict and entered it without clarifying instructions. Three categories of damages on the special verdict form were awarded to Curtis Adkins: lost earnings of $125,000, necessary medical expenses of $60,000, and physical, mental, and emotional pain or suffering of $700,000. Mary Adkins was awarded $200,000. Since this award was made pursuant to the advisory jury's verdict, this court cannot indulge in the presumption that in a trial before a judge as factfinder, evidence which is improper will be disregarded. Westwood Chemical, Inc. v. Owens-Corning Fiberglas Corp., 445 F.2d 911, 918 (6th Cir.1971), cert. denied, 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 786 (1972); Mallory v. Citizens Utilities Co., 342 F.2d 796, 797-98 (2d Cir.1965). In addition, the trial court made no findings of the pertinent considerations entering into the award. This court is unable to ascertain the facts upon which the trial court relied in awarding the amount of damages it did, and, consequently, it is not in a position to evaluate the issues joined in regard to the damages award, particularly the future damages claim. See, e.g., Lewis v. Pennington, 400 F.2d 806, 816-18 (6th Cir.), cert. denied, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968); Anthan v. Professional Air Traffic Controllers, 672 F.2d 706, 711-12 (8th Cir.1982). Finally, without specific findings to review, the damage award appears to be overly excessive, especially the award for pain and suffering. Thus, a remand for itemization and probable adjustment of the award is particularly appropriate.
 
 
 36
 Accordingly, the court affirms the district court's judgment on the issue of liability, vacates the damages award and remands the case to the district court for a proper determination of damages supported by findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).
 
 
 
 [1]
 Recently, the Ohio Supreme Court explicitly recognized that the failure to warn is itself sufficient to state a cause of action in strict liability. Crislip v. TCH Liquidating Co., 52 Ohio St.3d 251, 556 N.E.2d 1177 (1990)
 
 
 [2]
 On cross appeal, Curtis and Mary Adkins charged that the trial court erred in reducing the damages recoverable against ACL under the negligence claim by 53 percent, which was the percentage of negligence attributable to Celotex. Adkins had no negligence right of action against his employer. See Blakenship v. Cincinnati Milacron Chemicals, Inc., 69 Ohio St.2d 608, 433 N.E.2d 572, cert. denied, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982)
 Under the Ohio comparative negligence statute, Ohio Revised Code (O.R.C.) section 2315.19, recovery for damages against more than one negligent party is in proportion to the degree of negligence of each party from whom recovery is allowed. O.R.C. 2315.19(A)(2) (1980) (emphasis added). As argued by the Adkinses, since no negligence recovery is allowed against Celotex, the court should not have reduced the damages by that degree of fault attributable to Celotex.
 The court expresses no opinion as to this claim. First, since the Adkinses will recover the full amount of the damages award pursuant to the strict liability claim, this argument is largely moot. Second, the court is reluctant to resolve a question of statutory interpretation that has not yet been addressed by the state courts.