Linda P. DITTO, Plaintiff,

v.

MONSANTO COMPANY,
et al., Defendants.

Nos. 5:91CV0722, 1:91CV1019.

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 19, 1993.

Maurice L. Heller, Sr., Nurenberg, Plevin, Heller & McCarthy, Cleveland, OH, Joseph C. Kohn, Martin J. D'Urso, Kohn, Nast & Graf, Arnold E. Cohen, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Linda P. Ditto.

Thomas M. Parker, Lori L. Siwik, Roetzel & Andress, Akron, OH, for Monsanto Co.

John Sunderland, Julie D. Vannatta, Thompson, Hine & Flory, Columbus, OH, for ENSR.

Alton L. Stephens, Jr., Paul J. Schumacher, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, for Ohio Transformer Corp. and Controlled Power Corp.

### *MEMORANDUM OF OPINION*

### I. INTRODUCTION

MANOS, District Judge.

On April 19, 1991, Linda P. Ditto, plaintiff, filed Case No. 5:91CV0722 in federal court on behalf of her deceased husband, Robert V. Ditto ("Ditto"), against Monsanto Company, SunOhio n/k/a ENSR ("ENSR"), Ohio Transformer Corporation, and Controlled Power Corporation, defendants. On the same day she filed identical claims against these defendants in the Court of Common Pleas for Stark County. On May 24, 1991, the Stark County case was removed and docketed in this court as Case No. 1:91CV1019. For purposes of this memorandum and order both actions are considered together.

Linda Ditto claims that her deceased husband, Robert, was exposed to dielectric insulating fluids containing polychlorinated bi-

phenyls ("PCBs") from July 1979 until August 1988. Ditto worked at ENSR as a field mechanic, and later as a warehouse mechanic, using systems designed to remove PCBs from electrical transformers. ENSR serviced transformers—owned by electrical companies and others—which contained PCB dielectric fluids made by Monsanto, the sole manufacturer. Linda Ditto alleges that Robert Ditto contracted acute non-lymphocytic myelomonocytic leukemia from exposure to PCB's and died from complications of the disease.

On November 6, 1991, defendant ENSR was dismissed, with prejudice, by stipulation of the parties. On September 22, 1992, the plaintiff voluntarily dismissed, with prejudice, defendants Ohio Transformer Corporation and Controlled Power Corporation.

On September 18, 1992, defendant Monsanto Company filed its motion for summary judgment. For the following reasons, the motion for summary judgment is granted.

## II. FACTS

### 1. Background of PCBs

The parties stipulate that before the 1930's, the most common dielectric fluid used in electrical distribution systems was mineral oil. However, mineral oil is highly flammable and explosions could result from the failure of electrical equipment containing the oil. As a result, the use of mineral oil equipment carried an unacceptable risk.

In the early 1930's, the electrical equipment industry developed dielectric fluids containing PCBs as an alternative to mineral oil. PCBs do not conduct electricity and are fire and explosive resistant. In 1933 the United States government awarded patents to electrical equipment manufacturers, and in 1935 the National Electrical Code [1] permitted the use of PCBs in electrical equipment.

In 1935 Monsanto began to manufacture and sell dielectric fluids made pursuant to the specifications of the patents held by the electrical equipment manufacturers. The fluids contained PCBs.

Between 1935 and 1977 commercial mixtures of PCB dielectric fluids were manufactured by Monsanto and several foreign companies. Monsanto was the sole manufacturer of PCBs in the United States.

The fluids were sold in *bulk,* and were packaged and shipped in railroad cars, tank trucks and 55 gallon drums. Purchasers received warnings and handling instructions which cautioned against skin or clothing contact with PCBs or prolonged breathing of PCB vapors. Beginning in 1971, Monsanto supplied its customers with PCB Material Safety Data Sheets which it periodically updated.

Electrical equipment manufacturers, Monsanto's customers, sold or leased electrical equipment containing PCB dielectric fluid. Many pieces of the equipment were used in those locations where the fire and explosive resistant qualities of PCBs were desired by the ultimate purchaser or required by state or local fire codes.

Monsanto contends that it delivered the PCB dielectric fluids to its customers in bulk form. Monsanto's customers then sealed the appropriate amount of the fluid into metal casings, meant to be unsealed only by experienced personnel, and placed them in the transformers. The transformers were then sold to and serviced by customers of Monsanto's customer.

Monsanto states it had no control over the fluids after they reached its customer. It also states it had no control over safety communications concerning PCBs between its customer and the purchaser or servicer of the customer's equipment, and no way by which to know who might ultimately be exposed to the PCBs by servicing the transformers.

### 2. Health Issues Concerning PCBs and Continued Use

The parties further stipulate that the records, reports and other exhibits submitted by them indicate that in the late 1960's, environmental researchers reported evidence of the

1. The National Electrical Code is an advisory code resulting from the efforts of the insurance and electrical industries and architectural interests. It has been widely accepted and serves as the basis for many state and municipal electrical codes.

presence of PCBs in various environmental samples. Reports of adverse health effects following an incident in Japan in which individuals had accidentally ingested rice oil contaminated with PCBs were sent to Monsanto and, at this same time, Monsanto was cooperating with government research and conducting its own studies on PCB toxicity.

In February, 1970, Monsanto issued letters to its PCB dielectric fluid customers alerting them to the potential hazards of PCB exposure and recommending that they notify the equipment purchasers and servicers about the health and safety issues. The letter also stated that Monsanto would not be in contact with the ultimate consumers of the fluids and that it was relying on its customers to contact them.

In January, 1972, Monsanto ceased manufacturing and selling PCBs for any application except dielectric fluids for use in totally enclosed electrical systems.

Health concerns heightened in the mid–1970's and numerous studies were undertaken. However by 1988 researchers could pinpoint no demonstrable chronic health effects in humans, with the exception of chloracne.

### 3. The Regulation of PCBs

The parties exhibits show that by the 1970's the electrical equipment industry, including manufacturers and users, had more than forty years of experience and knowledge in the operation, use and servicing of equipment containing PCB dielectric fluids. In addition, they had experience with employees who handled PCB dielectric fluids and had prepared bulletins and material safety data sheets on the toxicity of PCBs.

The parties submitted exhibits indicating that from 1971 to 1974, Monsanto, electrical equipment manufacturers, electrical utilities, electrical equipment service companies, the EPA, the U.S. General Services Administration, the Tennessee Valley Authority, the U.S. Department of Agriculture, the U.S. Department of the Army, and others served on a committee to develop the American National Standards Institute's ("ANSI") standards for the safe use, maintenance, and disposal of PCB materials used in electrical

equipment. The ANSI standards included specific safety precautions for handling PCBs, and labeling requirements for tankcars, drums and cans to transport PCBs. Monsanto states, and the plaintiff does not contest, that it followed all the guidelines concerning the regulations and warnings as to PCBs.

In 1971 five departments of the executive branch of the federal government established an Interdepartmental Task Force on PCBs. Monsanto, the electrical equipment manufacturers, and others submitted information regarding the risks and benefits of PCBs at the request of the Task Force.

The Task Force made several findings and concluded that PCBs should be "restricted to essential or non-replaceable uses which involve minimal direct human exposure since they can have adverse effects on human health" but that the "use of PCBs should not be banned entirely."

In 1974 the U.S. Occupational Health and Safety Administration ("OSHA") adopted regulations establishing permissible exposure levels for humans. All employers handling PCBs were required to abide by the OSHA regulations in their places of employment.

In 1976, Congress enacted the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601, *et seq.,* to regulate the use of industrial chemicals, including PCBs. The EPA stated that PCBs used in a totally enclosed manner "will not present an unreasonable risk of injury to human health or the environment."

### 4. SunOhio/ENSR and PCBs

SunOhio/ENSR states that at all times relevant to this action it was an entity engaged in the business of designing and building rigs to remove PCBs and other contaminants from transformer oil and also in the business of using the rigs for removing PCBs and other contaminants from the oil. SunOhio [2] was formed in 1976 as a partnership between Ohio Transformer Corporation, a transformer repair company, and Sun Company, a manufacturer of transformer dielectric fluids.

---

**2.** ENSR purchased SunOhio in 1988.

It further states, and the plaintiff does not contest, that it was formed to develop technology which would destroy PCBs, present as a result of contamination, in mineral oil transformer fluids, and to service potentially contaminated transformers. PCBs were not intended for use in mineral oil transformers. However, mineral oil transformers could become contaminated with PCBs when third parties used the same equipment to service both PCB transformers and mineral oil transformers.

In early 1979, in response to the Environmental Protection Agency ("EPA") regulations concerning PCBs, SunOhio/ENSR developed a mobile "PCBX" process to destroy PCBs in the transformer mineral oils.[3] In September 1979, a commercial-scale prototype reactor was constructed and tested. Using this mobile technology ENSR was hired as an independent contractor by owners of the electrical equipment to service mineral oil transformers contaminated with PCBs and reduce the PCB content of the oil to levels below the EPA PCB limits.

### 5. Robert V. Ditto

The parties stipulate that on April 21, 1989, Robert V. Ditto died of acute myelomonocytic leukemia and that prior to his death he had been employed by ENSR from July 1, 1979 to August 4, 1988. He worked in three capacities during his employment: 1.) he performed substation field service work from a mobile unit which traveled to sites requested by customers; 2.) he performed repair and maintenance of transformers at the substation; and, 3.) he was employed in the warehouse to maintain ENSR's equipment, including those potentially containing PCBs. Ditto was never employed by Monsanto.

From July 1979 until January 1981, Ditto worked in the field service department in a mobile service unit called a reclamation rig. The reclamation rig was sent into the field as needed and performed oil reclamation to destroy PCBs in mineral oil transformers. ENSR serviced only mineral oil based transformers but knew that it was possible that the mineral oil could become contaminated with PCBs.

That the owner or ENSR would do tests on the transformer to determine the level, if any, of PCBs in the transformer fluid, indicates that these companies were aware of the potential hazards of contamination of the mineral oil by PCBs. Safety equipment was supplied to Ditto by ENSR for his use when working on the mineral oil transformers.

In late 1980 or early 1981 Ditto continued to perform maintenance and repair work on transformers, but was no longer assigned to the mobile unit. Plaintiff states that Ditto regularly used all the safety equipment supplied to him by ENSR.

In 1982 Ditto was transferred to the warehouse division of ENSR and devoted about 25% of his time to maintenance work on PCBX rigs. He worked in the warehouse until 1988 and continued to use the safety equipment provided.

The plaintiff concedes that the possibility of exposure to PCBs through Ditto's employment was always expected, and that Ditto used the protective safety equipment supplied by ENSR. She also states that ENSR provided Ditto with information available on PCBs from the manufacturers.

In its motion for summary judgment, Monsanto states that:

1.) Plaintiff cannot prevail on her negligence and strict liability for failure to warn claims because Monsanto is a bulk supplier of dielectric insulating fluids containing PCBs to a sophisticated user, ENSR, and that therefore Monsanto had no duty to warn Ditto of the danger of PCBs.

2.) Plaintiff cannot prevail on her strict liability for defective design claim because Monsanto did not design the PCB dielectric fluids.

3.) Plaintiff cannot prevail on her strict liability claims under the consumer expectation test because Ditto's working with PCBs was not beyond his consumer expectation and he was so warned by his employer.

---

**3.** The PCBX process runs transformer mineral oil contaminated with PCBs through a closed-loop continuous circulation system until the PCBs in the oil are destroyed. The PCBX process does not service PCB transformers, only mineral oil transformers.

4.) Monsanto owed no duty to Ditto who was an employee of ENSR, an independent contractor engaging in potentially hazardous activities for profit.

5.) Plaintiff cannot prevail on her breach of warranty claims because Ditto was not in privity of contract with Monsanto, and a claim of breach of implied warranty merges with her strict liability claims.

## III. THE STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) sets forth the standard for granting a motion for summary judgment. It states in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

This standard has been explained by the U.S. Supreme Court in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson* the Court set out the requisites needed to show there is no genuine issue as to a material fact. The Court stated:

> [a]s to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Anderson* at 248, 106 S.Ct. at 2510.

The Court also held that "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

Regarding the existence of a genuine issue of material fact, the Court held that summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, the Court also noted that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511. The nonmoving party has the burden of producing the evidence, and the "mere existence of a scintilla of evidence in support of the plaintiffs' position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512. If evidence is not presented, summary judgment is appropriate.

■ Once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586, 106 S.Ct. at 1335. However, any inferences from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Id.* at 587, 106 S.Ct. at 1356.

In *Celotex* the Court explained that the nonmoving party must designate specific facts showing a genuine issue for trial. Summary judgment is appropriate if a party, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex* at 322, 106 S.Ct. at 2552. The moving party is not required to prove the absence of a genuine issue of fact, even with respect to an issue on which the nonmoving party bears the burden of proof. *Id.* at 325, 106 S.Ct. at 2554. "Instead ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

The *Celotex* Court also stated the "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses", *Id.* at 323–24, 106 S.Ct. at 2553, and that the summary judgment procedure should not be regarded as a "disfavored procedural shortcut" but should be viewed as "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inex-

pensive determination of every action.'" *Id.* at 327, 106 S.Ct. at 2555.

A thorough examination of all the evidence presented in this case indicates that there is no material issue as to the following facts: 1.) Monsanto warned its customers of the dangers inherent in exposure to PCBs, 2.) Monsanto's customers knew of the risks of PCBs and participated in government studies and committees designed to deal with the problem of PCB exposure, 3.) Ditto never worked for Monsanto or for a customer of Monsanto, and, 4.) Ditto died of myelomonocytic leukemia.

## IV. ANALYSIS

### 1. Bulk Supplier/Sophisticated User Defense

Plaintiff, Linda Ditto, claims that Monsanto was negligent and is strictly liable because of its failure to warn Ditto of the hazards of the PCBs contained in the mineral oil transformers. Monsanto claims that it had no duty to Ditto because it is a bulk supplier and ENSR is a sophisticated user of the product supplied.[4]

The Restatement (Second) of Torts § 388 states:

**Chattel Known to be Dangerous for Intended Use**

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Comment "n" to this section advises that the manufacturer's duty to warn may be discharged by providing information of the dangerous properties of the product to intermediaries, such as Monsanto's customers, *provided* Monsanto could reasonably rely on its customers to communicate the information to the ultimate users of the product or those who will be exposed to it.

Comment "n" also states that it is impossible to set forth any set of rules which automatically determine in advance whether one supplying the chattel has satisfied the duty to those who are to use it by informing the intermediary. However, the comment notes that "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." Restatement (Second) of Torts, comment "n".

Although most negligence actions are resolved by submission to a jury, "it would be a mistake to conclude summary judgment is never appropriate in a negligence action." *Adams v. Union Carbide Corp.*, 737 F.2d 1453 (6th Cir.1984) (quoting *Croley v. Matson Navigation Company*, 434 F.2d 73 (5th Cir.1970)).

■ The bulk supplier/sophisticated user doctrine has been recognized in Ohio, *Adams, supra;*[5] *Adkins v. GAF Corp.*, 923 F.2d 1225 (6th Cir.1991); *Smith v. Walter C. Best, Inc.*, 927 F.2d 736 (3rd Cir.1990) (following Ohio law), and can form the basis of a defense to a claim of strict liability in tort for failure to adequately warn of dangers inherent in a product.

---

4. The Ohio Supreme Court has recognized that the standard imposed upon the defendant in a strict liability claim based on inadequate warning is the same as that imposed by a negligence claim with the same basis. *Crislip v. TCH Liquidating Co.*, 52 Ohio St.3d 251, 556 N.E.2d 1177 (1990).

5. While the district court concluded that *Adams* was not a true "sophisticated purchaser" case, because, unlike this case, warnings were provided by the supplier to the employer, the commentaries have categorized the case as one involving the sophisticated purchaser defense. *See*, Note, *Failures to Warn and the Sophisticated User Defense*, 74 Va.L.Rev. 579, 605 (1988).

Monsanto claims it is a bulk supplier because it shipped its product in railroad cars, tank trucks and 55 gallon drums. The bulk seller doctrine applies when a product is sold in bulk to purchasers which then repackage [6] the product or incorporate it into another product as a component. *Adams v. Union Carbide Corp.*, 737 F.2d 1453 (6th Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984).

Plaintiff claims that Monsanto cannot qualify as a bulk supplier because it shipped its product in 55 gallon drums which Ditto may have used. However, the bulk supplier doctrine applies to manufacturers which ship in containers smaller than tank cars or trucks. *See Cohen v. Steve's Ice Cream,* 737 F.Supp. 8 (D.Mass.1990) (bulk supplier doctrine applied to manufacturer who sold a chemical in 50–gallon drums).

The plaintiff further claims that some of the 55 gallon drums used by SunOhio, and perhaps therefore Ditto, to collect waste from the clean up of spills may have been Monsanto's drums and should have had warning labels, but she offers no evidence that Monsanto or the electrical equipment manufacturers ever shipped any drums of dielectric fluids directly to SunOhio. The exhibits indicate that the fluids were shipped to the electrical equipment manufacturers who sealed them in the transformers.

Monsanto claims that its customers were sophisticated users. They were manufacturers of electrical equipment which repackaged Monsanto's product into their equipment which was sold to their customers.

From the affidavits, depositions, government reports, and internal memoranda from a variety of companies filed as exhibits to the defendant's motion for summary judgment and the plaintiff's brief in opposition to the motion, the facts indicate that Monsanto's customers were intermediaries on which Monsanto could rely to warn the ultimate users of the PCBs. They as well as Monsanto were knowledgeable about the risks of PCBs, had participated with Monsanto and others in studies of, and were members of committees related to, PCB toxicity and human health risks. In addition, they had knowledge of the federal government's guidelines as to the handling, destruction and disposal of PCBs, and were required to abide by the OSHA regulations as to PCBs in their workplaces.

The exhibits indicate that Monsanto knew its customers and knew that they, as well as it, were well aware of the dangers of PCBs. Monsanto supplied its customers with Material Safety Data Sheets which were periodically updated. It also wrote to its customers putting them on notice that Monsanto would not contact the ultimate users of its product and that it expected them to do so. Monsanto complied with the government's warning regulations for PCBs and knew that its customers must also comply.

Pursuant to the holding of the *Adams* court, the exhibits establish that Monsanto was a bulk supplier, and the electrical equipment manufacturers were sophisticated users who "repackaged" Monsanto's product for use in their product.

The "pivotal inquiry in determining whether [the bulk supplier/sophisticated user] defense is available is a fact-specific evaluation of the reasonableness of the supplier's reliance on the third party to provide the warning." *Adkins* at 1230. Plaintiff asserts that this defense always raises a question of fact for the jury because of the "reasonableness" standard. However, this is not reflective of the case law in this Circuit. In *Adams* the court applied the bulk supplier/sophisticated user defense and granted summary judgment for the defendant.

The *Adams* court granted a bulk supplier of a liquid chemical summary judgment upon a finding that it had no duty to warn the employees of its purchaser. The court held that the supplier had no duty to warn the purchaser's employees because the purchaser knew of the chemical's dangers and had exclusive control over its employees and the chemical after delivery.

---

**6.** Plaintiff presents no evidence that Monsanto's product was not "repackaged" by the electrical equipment manufacturers.

The court also held that there was no evidence that the defendant was familiar with the facility where the plaintiff was exposed, that it could have placed warnings on the product, or that it did not warn its own customers. *Id.* at 1231.

Under the holding in *Adams,* Monsanto had no duty to warn the employees of Sun-Ohio/ENSR. The electrical equipment manufacturers which sealed the PCBs in the equipment, and SunOhio/ENSR which serviced the equipment, knew of the dangers of PCBs, the manufacturers had exclusive control over the fluids and their employees after Monsanto delivered the product, and Monsanto's customers had a duty to warn the ultimate user of the dangers of servicing their product, the transformers.[7]

In addition, the exhibits submitted by both parties indicate that Monsanto knew the dielectric fluids containing the PCBs were "repackaged" and sealed in the transformers by the electrical equipment manufacturers prior to sale or servicing of the transformers. Monsanto had no way to put a warning on the product, no way by which to know or become familiar with who purchased or serviced the equipment, and no way by which to know for whom Ditto worked or the conditions under which he serviced the electrical equipment.

Because it was reasonable for Monsanto to rely on its customers, the electrical equipment manufacturers, to relay appropriate warnings to the ultimate purchasers of the electrical equipment, the bulk supplier/sophisticated user defense is available to it.

As a result, Monsanto owed no duty to Ditto to warn him of the potential dangers of PCBs when servicing transformers using SunOhio's PCBX system, and Ditto cannot prevail on the theory of negligence and strict liability for failure to warn.

### 2. Strict liability

Ohio Rev.Code Ann. § 2307.75 states, in part:

[A] product is defective in design ... if either of the following applies:

(1) When it left the control of its manufacturer, the foreseeable risks associated with its design ... exceeded the benefits associated with that design ...;

(2) It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner....

(E) A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by a characteristic of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

(F) A product is not defective in design or formulation if at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover damages without substantially impairing the usefulness or intended purpose of the product, unless the manufacturer acted unreasonably in introducing the product into trade or commerce.

Ohio Rev.Code Ann. § 2307.75.

### a. Defective Design or Formulation

■ Strict liability in tort rests on proof of a defect in the design of a product if it is not "of good and merchantable quality, fit and safe for ... [its] ordinary intended use." *Lonzrick v. Republic Steel Corp.,* 6 Ohio St.2d 227, 218 N.E.2d 185 (1966). In order to establish a prima facie case, the plaintiff has to specifically identify a defect and prove that the defect was the proximate cause of the injury. *State Farm Fire & Casualty Co. v. Chrysler Corp.,* 37 Ohio St.3d 1, 523 N.E.2d 489 (1988).

■ Liability does not arise simply because the defendant manufactured the product which allegedly caused injury to the

---

7. In fact, Monsanto had ceased PCB sales prior to Ditto's employment at SunOhio/ENSR and could not have known that SunOhio/ENSR would develop its PCBX system to decontaminate mineral oil.

plaintiff. *Leichtamer v. American Motors Corp.*, 67 Ohio St.2d 456, 424 N.E.2d 568 (1981).

◼ The parties agree that in 1933, patents were issued to electrical equipment manufacturers to manufacture dielectric fluids containing PCBs. Monsanto entered the business in 1935 and made the fluids for the manufacturers pursuant to the specifications in the patent.

The product was designed and formulated to be exactly what Monsanto manufactured—dielectric fluid containing PCBs—and was fit for its specific, intended use.

The plaintiff does not assert any design defect in the dielectric fluids and does not assert that there was an alternative design or formulation of the dielectric fluids which would have been fit for the fluids' intended use.

### b. Consumer Expectation test.

"A product is defective under Ohio law if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Delk v. Holiday Inns, Inc.*, 545 F.Supp. 969, 971 (S.D.Ohio 1982). "The design of a product cannot be held defective or unreasonably dangerous ... unless the product is being used in an intended or reasonably foreseeable manner." *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 472 N.E.2d 707, 711 (1984). "Furthermore, a manufacturer need not anticipate all uses to which its product may be put, to guarantee that the product is incapable of causing injury in all its possible uses." *Id.* (citing *Lonzrick*, 218 N.E.2d 185 (Ohio 1966)).

The plaintiff concedes that Ditto was at all times aware of the intended use of SunOhio's PCBX system and the potential presence of PCBs when working with the system. Ditto did not use PCBs, he used the SunOhio PCBX system designed to destroy PCBs in mineral oil.

Monsanto did not produce the PCBX system or the mineral oil containing PCBs. The PCBX system was sealed, and specific instructions for techniques to be followed in the event of contact with the oil were clearly spelled out to SunOhio's customers.

Ditto's employer was also not a consumer of PCBs. A portion of his job was to operate a rig designed to remove PCBs from contaminated mineral oil. Monsanto could not reasonably foresee that SunOhio would invent a rig to remove PCBs from contaminated mineral oil and had no way by which to know who might possibly come into contact with PCBs through the contaminated oil.

The plaintiff, however, contends that Monsanto had a duty to warn about the dangerousness of PCBs under the consumer expectation theory of recovery. Viewing the facts in the light most favorable to the plaintiff, there are no facts alleged to show Ditto's employer was a "consumer" or "user" of PCBs, or that Monsanto could have anticipated the "use" to which SunOhio put its product.

### 3. SunOhio as an Independent Contractor.

◼ The plaintiff and Monsanto agree that SunOhio was an independent contractor and was an expert service company in the business of handling electrical equipment containing dielectric fluids with PCBs. Ditto was an employee of SunOhio, not Monsanto.

In *Wellman v. East Ohio Gas Co.*, 160 Ohio St. 103, 113 N.E.2d 629, 632 (1953), the Ohio Supreme Court held that the independent contractor, not the utility, was liable for the plaintiff's injuries because the contractor knew the condition of danger which resulted in plaintiff's injury. The plaintiff in this case states that this holding means that the contractor must know the exact danger to which the individual is exposed, in this case leukemia. In the absence of such knowledge by the contractor, the manufacturer is liable for the plaintiff's injuries unless it seeks him or her out and gives specific warnings.

◼ However, this is not a proper reading of Ohio law. *Wellman* holds that the entity employing an independent contractor has no duty to the contractor's employees when the contractor undertakes work involving "real or potential dangers." *Id.* 113 N.E.2d at 630. Summary judgment is appropriate, under *Millhouse v. General Tire and Rubber Co.*, 9 Ohio App.3d 203, 459 N.E.2d

595

623, 625 (1983), when the independent contractor is "very familiar" with the pertinent dangers.

From the exhibits attached to its motion Monsanto has shown that SunOhio was "very familiar" with the pertinent dangers. SunOhio provided many pages of detailed written instructions concerning how to conduct oneself when exposure to PCBs had occurred.

There is no dispute that Ditto knew from the outset of his employment that he would be working with toxic and dangerous chemicals, that SunOhio supplied him with safety equipment which he used, and that SunOhio gave him verbal and written instructions on how to handle the electrical equipment. Plaintiff also concedes that Ditto knew the fluids could be carcinogenic.

On these facts, Monsanto cannot be held liable for injuries to employees of SunOhio, an independent contractor hiring individuals to work with toxic and potentially harmful chemicals.

#### 4. Breach of Warranty

■ Finally, plaintiff claims that the PCB dielectric fluids were defective because they did not conform to representations made by Monsanto. For plaintiff to establish a claim of breach of warranty in tort she must allege and prove 1.) the existence, nature and extent of the express warranty issued by Monsanto, 2.) that Ditto relied on the warranty, 3.) that the warranty was breached and 4.) that Ditto's injuries were proximately caused by the breach of warranty. *Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583 (1965); *Miles v. Kohli & Kaliher Associates, Ltd.*, 917 F.2d 235 (6th Cir.1990).

■ A claim of breach of implied warranty is virtually indistinguishable from strict liability in tort. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977). Implied warranty in tort claims merge with strict liability claims. *Id.*

The plaintiff offers no evidence to indicate that Monsanto made any representations regarding PCBs or PCB dielectric fluids to Ditto. There can be no claim of breach of express warranty because the plaintiff does not allege facts sufficient to establish that there was any express warranty.

The breach of warranty claim must be a breach of implied warranty which merges with her strict liability claim, and for which, as stated above, summary judgment is appropriate.

### V.  CONCLUSION

For the foregoing reasons, Monsanto is entitled to summary judgment on all the plaintiff's claims. Accordingly, Monsanto's motion for summary judgment is granted.

IT IS SO ORDERED.